## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **EON CORP. IP HOLDINGS, LLC,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION FILE** |
| | § | |
| **v.** | § | **No. 6:09-cv-116-LED** |
| | § | |
| **SENSUS USA INC., ET. AL.,** | § | |
| | § | |
| **Defendants.** | § | <u>JURY TRIAL DEMANDED</u> |
| | § | |

## <u>DEFENDANT SENSUS USA INC.'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND AMENDED COUNTERCLAIMS TO SECOND AMENDED COMPLAINT</u>

Defendant Sensus USA Inc. ("Sensus") provides this first amended answer to the Second Amended Complaint ("Complaint") of Plaintiff EON Corp. IP Holdings, LLC ("EON"), and asserts its affirmative defenses, and states its counterclaims as follows:

### <u>PARTIES</u>

1.     Plaintiff EON Corp. IP Holdings, LLC is a Texas limited liability company with its registered office located at 110 North College, 500 Plaza Tower, Tyler, Texas 75702.

**<u>ANSWER:</u>**     Sensus is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1 and, therefore, denies these allegations.

2.     Defendant Sensus is a Delaware corporation with its principal place of business at 8601 Six Forks Road, Suite 300, Raleigh, North Carolina 27615-2965.  The causes of action against Sensus in this Complaint arose from or are connected with purposeful acts committed by Sensus in Texas because, within the State of Texas and/or this judicial district, Sensus (a) uses or

induces others to use a two-way communication network to provide paging, messaging, and/or telemetry services and (b) transacts other business in Texas.  Sensus has been served with summons and has entered an appearance in this lawsuit.

**ANSWER:**   Defendant Sensus USA Inc. admits that it is a Delaware corporation and that it transacts business in the State of Texas and/or this judicial district.  Sensus denies that it is committing purposeful acts that give rise to any cause of action asserted in EON's Complaint. Sensus admits that it has been served with summons and has entered an appearance in this lawsuit.  Sensus denies the remaining allegations of paragraph 2.

3.       Defendant Bell Industries is a California corporation with its principal place of business at 8888 Keystone Crossing, Suite 1700, Indianapolis, Indiana 46240-7657.  The causes of action against Bell Industries in this Complaint arose from or are connected with purposeful acts committed by Bell Industries in Texas because, within the State of Texas and/or this judicial district, Bell Industries (a) uses or induces others to use a two-way communication network to provide paging, messaging, and/or telemetry services and (b) transacts other business in Texas. Bell Industries has been served with summons and has entered an appearance in this lawsuit.

**ANSWER:**   Sensus is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3 and, therefore, denies these allegations.

4.       Defendant Vehicle Manufacturers is a New York corporation with its principal place of business at 2095 Expressway Drive, Hauppauge, New York, 11788.  The causes of action against Vehicle Manufacturers in this Complaint arose from or are connected with purposeful acts committed by Vehicle Manufacturers in Texas because, within the State of Texas and/or this judicial district, Vehicle Manufacturers (a) uses or induces others to use a two-way

communication network to provide paging, messaging and/or telemetry services and (b) transacts

other business in Texas.  Defendant Vehicle Manufacturers has been served with summons and

is currently in default and a clerk's entry of default was entered against Vehicle Manufacturers

on October 30, 2009.

**ANSWER:**     Sensus is without knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 4 and, therefore, denies these allegations.

## JURISDICTION AND VENUE

5.     This is an action for patent infringement under the patent laws of the United

States, 35 U.S.C. §271.

**ANSWER:**     Sensus admits that EON purports to bring this action under the patent laws of the

United States, 35 U.S.C. §271, but Sensus denies any liability thereunder.

6.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1338(a).

**ANSWER:**     Sensus does not contest subject matter jurisdiction over this action.

7.     This Court has personal jurisdiction over Defendants.  Defendants have conducted

and do conduct business within the State of Texas.  Defendants, directly or through

intermediaries, offer for sale, sell, and/or advertise (including through the provision of an

interactive web page) their services in the State of Texas and/or the Eastern District of Texas.

These infringing services have been and continue to be purchased and/or used by consumers in

the State of Texas and/or the Eastern District of Texas.  Defendants have committed the tort of

patent infringement within the State of Texas, and have committed the tort of patent infringement within the Eastern District of Texas.

**ANSWER:**    Sensus admits that it has conducted and does conduct business within the State of Texas.  Sensus denies that it, directly or through intermediaries, is offering for sale, selling, and/or advertising services that practice the subject matter claimed in the patents involved in this action.  Sensus denies that it has committed the tort of patent infringement within the State of Texas, within the Eastern District of Texas, or elsewhere in the United States.  Sensus is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 7 and, therefore, denies these allegations.

8.    Venue is proper in this Court pursuant to 28 U.S.C. §§1391 and 1400(b).

**ANSWER:**    Sensus admits that venue is proper under 28 U.S.C. §§ 1391 and 1400(b).

## COUNT I: PATENT INFRINGEMENT

9.    On February 7, 1995, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '101 Patent entitled "Interactive Nationwide Data Service Communication System for Stationary and Mobile Battery Operated Subscriber Units" after a full and fair examination.  EON is the assignee of all rights, title, and interest in and to the '101 Patent and possesses all rights of recovery under the '101 Patent, including the right to recover damages for past infringement.

**ANSWER:**    Sensus admits that U.S. Patent No. 5,388,101 ("the '101 Patent") is entitled "Interactive Nationwide Data Service Communication System for Stationary and Mobile Battery Operated Subscriber Units," and that it was issued by the U.S. Patent and Trademark Office on February 7, 1995.  Sensus denies that the '101 Patent was subject to a full and fair examination.

Sensus is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 9 and, therefore, denies these allegations.

10.     On January 2, 1996, the USPTO duly and legally issued the '546 Patent, entitled "Interactive Nationwide Data Service Communication System for Stationary and Mobile Battery Operated Subscriber Units" after a full and fair examination. EON is the assignee of all rights, title, and interest in and to the '546 Patent and possesses all rights of recovery under the '546 Patent, including the right to recover damages for past infringement.

**ANSWER:**     Sensus admits that U.S. Patent No. 5,481,546 ("the '546 Patent") is entitled "Interactive Nationwide Data Service Communication System for Stationary and Mobile Battery Operated Subscriber Units," and that it was issued by the U.S. Patent and Trademark Office on January 2, 1996.  Sensus denies that the '546 Patent was subject to a full and fair examination. Sensus is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 10 and, therefore, denies these allegations.

11.     Each of the Patents-in-Suit is valid and enforceable.

**ANSWER:**     Sensus denies the allegations of paragraph 11.

12.     Upon information and belief, Sensus has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the Patents-in-Suit in this District, the State of Texas, and elsewhere by making, using, offering for sale, and/or selling two-way communication networks and/or data systems that fall within the scope of at least one claim of each of the Patents-in-Suit.

**ANSWER:**     Sensus denies the allegations of paragraph 12.

13.     Upon information and belief, Bell Industries has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the Patents-in-Suit in this District, the State of Texas, and elsewhere by making, using, offering for sale, and/or selling two-way communication networks and/or data systems that fall within the scope of at least one claim of each of the Patents-in-Suit. Additionally, upon information and belief, Bell Industries has willfully infringed the Patents-In-Suit.  Specifically, in the consolidated financials of Bell Industries and Bell Techlogix (Bell Industries' wholly owned subsidiary), as reported to the United States Securities and Exchange Commission in Bell Industries' Form 10-Q for the period ended March 31, 2009, Bell Industries details a December 1, 2008 Paging Equipment Processing and Distribution Statement of Work No. 1 ("Distribution Agreement"), pursuant to which Bell Techlogix provided paging equipment services to Velocita Wireless, LLC ("Velocita") in connection with Velocita's paging business. The Distribution Agreement was entered into on December 1, 2008. The Distribution Agreement was entered into more than two months after EON filed a patent infringement lawsuit against SkyTel Corp (the entity that Bell Industries alleges it purchased its paging business from) in this Court and styled *Eon Corp. IP Holdings, LLC v. Verizon Clinton Center Drive Corp., et al*, Civil Action No. 6:08-cv-00385. Upon information and belief, Bell Industries had actual knowledge of the lawsuit against SkyTel Corp. and that, as a result, all actions taken pursuant to the Distribution Agreement constitute willful infringement.

**ANSWER:**    Sensus is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 13 and, therefore, denies these allegations.

14.     Upon information and belief, Vehicle Manufacturers has been and is now infringing, directly and indirectly by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, the Patents-in-Suit in the State of Texas and elsewhere by making, using, offering for sale, and/or selling two-way communication networks and/or data systems that fall within the scope of at least one claim of each of the Patents-in-Suit.

**ANSWER:**     Sensus is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14 and, therefore, denies these allegations.

15.     EON has no adequate remedy at law against Defendants' acts of infringement and, unless Defendant is enjoined from their infringement of the Patents-in-Suit, will suffer irreparable harm.

**ANSWER:**     Sensus denies the allegations of paragraph 15.

16.     EON is in compliance with the requirements of 35 U.S.C. §287.

**ANSWER:**     Sensus is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 16 and, therefore, denies these allegations.

17.     Defendants, by way of their infringing activities, have caused and continue to cause EON to suffer damages in an amount to be determined at trial.

**ANSWER:**     Sensus denies the allegations of paragraph 17.

## RESPONSE TO PLAINTIFF EON'S PRAYER FOR RELIEF

Sensus denies that EON is entitled to any of the relief sought in the prayer or any relief whatsoever.

Further responding to the Complaint, Sensus alleges as follows:

## AFFIRMATIVE DEFENSES

Sensus asserts the following affirmative defenses and reserves the right to amend its answer as additional information becomes available:

## FIRST DEFENSE

18.     The Complaint fails to state a claim upon which relief can be granted because Sensus has not performed any act or thing and is not proposing to perform and act or thing in violation of any rights validly belonging to Plaintiff under the patents-in-suit.

## SECOND DEFENSE

19.     Sensus does not infringe and has not infringed, either directly, contributorily, or by inducement, any claim of the '101 Patent and the '546 Patent either literally or under the doctrine of equivalents.

## THIRD DEFENSE

20.     By reason of prior art and/or statements and representations made to and by the United States Patent and Trademark Office ("the Patent Office or PTO") during the prosecution of the applications that led to the issuance of the '101 Patent and /or the '546 Patent, and during reexamination proceedings of the '101 Patent and /or the '546 Patent, EON is estopped from asserting that the claims of the patents-in-suit can be construed as covering any activity of Sensus, either literally or under the doctrine of equivalents.

## FOURTH DEFENSE

21.     Each and every claim of the patents-in-suit is invalid and void for failure to comply with the requirements of Title 35, United States Code, including, but not limited to, Sections 102, 103, and 112.

## FIFTH DEFENSE

22.     The '101 Patent and the '546 Patent are further unenforceable by reason of unclean hands.

## SIXTH DEFENSE

23.     Any claim for damages for infringement of the patents-in-suit is limited by 35 U.S.C. § 287 to those damages occurring after notice of infringement.

## SEVENTH DEFENSE

24.     The '101 and '546 patents are unenforceable because of inequitable conduct in their procurement and during reexamination of those patents.  The duty of candor and good faith dealing with the PTO was violated in that material information, including information about on-going litigation involving the patents-in-suit, intentionally was not disclosed to the PTO with an intent to deceive the PTO.  Contrary to MPEP 2001.04, 2001.05, 2001.06(c), and 37 C.F.R. § 1.56, EON, including its prosecuting attorneys Christopher Rourke and the law firm of Jackson Walker LLP; EON's litigation counsel, including Daniel Scardino, Jeff Johnson, Cab Connor, and the law firm of Reed & Scardino; and others substantively involved with the prosecution of the patents-in-suit including Alfonso Barrigan (collectively, "the EON attorneys and principals"), did not notify the PTO about material information related to the ongoing litigations of the EON patents, including from *EON Corp. IP Holdings, LLC v. Verizon Clinton Center Drive Corp et al.*, 6:08-cv-00385-LED-JDL ("the *Verizon* case") and *EON Corp. IP Holdings, LLC v. Sensus USA Inc.*, 6:09-cv-00116-LED-JDL ("the *Sensus* case").

25.     During reexamination of the '101 patent (SN 90/010,383) and the '546 patent (SN 90/010,382), the EON attorneys and principals failed to disclose to the PTO and withheld from the PTO material information from these cases regarding the parties' claim construction

positions on the scope of the claims of the EON patents.  For the '101 and '546 patent reexaminations, this material information includes: Sensus's claim construction and summary judgment of indefiniteness briefing and EON's responses to that briefing; the Markman hearing transcripts from the *Verizon* and *Sensus* cases; the Court's May 17, 2010 Order in the *Verizon* case provisionally construing certain disputed claim terms from the '101 and '546 patents; and the parties' P.R. 4-1, P.R. 4-2, P.R. 4-3, and P.R. 4-5(d) disclosures and statements related to claim construction and EON's claim construction positions.  For the '546 patent reexamination, this material information further includes: Verizon's summary judgment of indefiniteness briefing, EON's response to Verizon's summary judgment of indefiniteness briefing, and Verizon's reply in support of its summary judgment of indefiniteness; and EON's reply claim construction brief.

26.    During the '101 and '546 patent reexaminations, Mr. Rourke filed information disclosure statements (IDS) on June 18, 2009 and September 2, 2009, in which the EON attorneys submitted prior art, pleadings, and other documents (including its complaint, defendants' answers, and infringement and invalidity contentions) from the *Verizon* litigation. Additionally, Mr. Rourke submitted an additional IDS on November 2, 2009 in the '101 and '546 patent reexaminations disclosing EON's infringement contentions against Sensus.  And in the '101 patent reexamination—but not the '546 patent reexamination— Mr. Rourke submitted a February 19, 2010 IDS disclosing EON's opening claim construction brief from the *Verizon* case and Verizon's responsive claim construction brief, and Verizon's and EON's patent rule claim construction disclosures.

27.    The submission of these IDS forms demonstrate that EON's reexamination counsel (and principals), including Mr. Rourke and Jackson Walker, were aware of the *Verizon*

and *Sensus* cases and EON's duty to submit material information from these litigations to the

PTO, as required by MPEP 2001.06(c), which recites:

> Where the subject matter for which a patent is being sought is or
> has been involved in litigation, the existence of such litigation and
> any other material information arising therefrom must be brought
> to the attention of the U.S. Patent and Trademark Office.
> Examples of such material information include evidence of
> possible prior public use or sales, questions of inventorship, prior
> art, allegations of "fraud," "inequitable conduct," and "violation of
> duty of disclosure." Another example of such material information
> is any assertion that is made during litigation which is
> contradictory to assertions made to the examiner. Environ Prods.,
> Inc. v. Total Containment, Inc., 43 USPQ2d 1288, 1291 (E.D. Pa.
> 1997). Such information might arise during litigation in, for
> example, pleadings, admissions, discovery including
> interrogatories, depositions, and other documents and testimony.

Based on their conduct before the PTO, Mr. Rourke and Jackson Walker were aware of EON's

obligation under MPEP 2001.06(c) and 37 C.F.R. § 1.56 as shown by their submission of

documents to the PTO such as orders of dismissal with respect to certain defendants, and their

practice earlier in the reexaminations of submitting all pleadings, prior art, discovery, and

contentions from the *Verizon* case in the June 18, 2009 and September 2, 2009 IDS forms.

Further, any reasonable prosecuting attorney, including Mr. Rourke, would be aware of the

obligations of MPEP 2001.06(c), as well as MPEP 2001.04 and 2001.05. These IDS forms also

demonstrate that EON's prosecution counsel Mr. Rourke and Jackson Walker were in

communication with EON's litigation counsel, including Messrs. Scardino, Johnson, Connor,

and the Reed & Scardino firm, and that EON's litigation counsel were aware of the pending

reexaminations. Indeed, Verizon and Sensus raised statements made by EON during

reexamination during the claim construction briefing in the *Verizon* and *Sensus* cases. Further,

Messrs. Scardino, Johnson, and Connor were part of the Jackson Walker firm until shortly before

the *Verizon* claim construction hearing and were aware of both the ongoing litigations and the patent reexaminations.

28.     Mr. Rourke failed to submit all relevant and material claim construction information from the *Verizon* and *Sensus* cases to the PTO.  In the '101 patent reexamination, Mr. Rourke did not submit any of the following to the PTO: (1) the parties' patent rule disclosures from the *Verizon* or *Sensus* cases; (2) Verizon's reply claim construction brief, Sensus's claim construction briefing and EON's responsive briefing, and Sensus and Verizon's summary judgment of indefiniteness briefing and EON's responsive briefing; (3) the transcripts from the March 3, 2010 or June 10, 2010 Markman hearings in the *Verizon* or *Sensus* cases; (4) the Court's May 17, 2010 provisional Markman order; (5) Sensus's and EON's supplemental Markman briefing regarding EON's statements made during reexamination; and (6) the defendants' motions for reconsideration and objections to the Court's provisional Markman order and EON's responses to those motions and objections.  In the '546 patent reexamination, Mr. Rourke did not submit any of the following to the PTO: (1) Sensus's and EON's patent rule disclosures from the *Sensus* cases; (2) Sensus's, Verizon's, and EON's claim construction and summary judgment of indefiniteness briefing from the *Sensus* and *Verizon* cases; (3) the transcripts from the March 3, 2010 or June 10, 2010 Markman hearings in the *Verizon* or *Sensus* cases; (4) the Court's May 17, 2010 provisional Markman order; (5) Sensus's and EON's supplemental Markman briefing regarding EON's statements made during reexamination; and (6) the defendants' motions for reconsideration and objections to the Court's provisional Markman order and EON's responses to those motions and objections.  Due to the awareness by litigation counsel of the reexaminations and communications with Mr. Rourke, and their involvement with the claim construction briefing in the *Verizon* and *Sensus* cases, Messrs.

Scardino, Johnson and Connor also failed to submit to the PTO these materials, notwithstanding their duty to provide this information to the PTO.

29.     This information that was not disclosed to and withheld from the PTO was material because it disclosed positions and arguments taken by EON, Sensus, and Verizon related to the scope, patentability, and validity of the '101 and '546 patent claims, including positions and arguments that were inconsistent with and contradicted those taken by EON and the PTO during the '101 and '546 patent reexaminations, or that were never raised during these reexaminations.  *See* MPEP 2001.05, 2001.06, and 2001.06(c).  This material information included information identified in paragraphs 30 – 38.

30.     <u>The scope and validity of claims having § 112 ¶ 6 elements:</u>  The claims of the '101 and '546 patents include many elements reciting "means for" performing a function that presumptively fall under § 112 ¶ 6.  During the *Verizon* and *Sensus* cases, Sensus and Verizon took positions that these terms fell under § 112 ¶ 6, and that many of these claim terms were indefinite for the specification's failure to disclose corresponding structure for these terms. Sensus and Verizon also took the position that the § 112 ¶ 6 presumption could not be overcome due to applicable law requiring the claim alone to clearly disclose structure for performing the recited § 112 ¶ 6 function (*e.g.*, base station reception means; reception means; network hub switching center means).  Sensus and Verizon's positions, and EON's responses to those positions, directly relate to the validity of EON's patents under § 112 ¶¶ 2 and 6.  During the reexaminations, the PTO held that all of the "means" terms overcame the § 112 ¶ 6 presumption. However, Messrs. Rourke, Scardino, Johnson, and Connor never disclosed to the PTO defendants' positions, as well as EON's own positions, on this issue in the *Verizon* and *Sensus* cases, including EON's position that certain of the "means" terms were § 112 ¶ 6 limitations, e.g.

base station reception means.  Had the PTO been aware of those positions, the PTO might have

found that certain § 112 ¶ 6 terms were indefinite and invalid.  Indeed, the Court found in its

provisional claim construction order that at least some "means" were subject to § 112 ¶ 6,

contrary to the PTO examiner's determination during reexamination.

31.     The obviousness of the asserted claims under § 103:  EON took the position

before the PTO that it would not have been obvious to combine the prior art Cunningham

reference with the Morales-Garza or Martinez prior art references, disputing the PTO's position

that there was a motivation to combine these prior art references.  The PTO had taken the

position that all of these prior art references were in the same field of endeavor—two-way radio

communications—which EON disputed by characterizing Cunningham as an IMTS system that

allegedly was incompatible with an IVDS/interactive video system such as Morales-Garza or

Martinez.

32.     Before the Court during claim construction, however, EON took the position that

its claimed invention, which referred to Morales-Garza and Martinez for support, was not limited

to an IVDS/interactive video system—and, instead, took the position that its claimed invention

was generally in the field of two-way radio communications, arguing that its invention could not

include or require video due to FCC IVDS bandwidth transmission limitations, and that the claim

preambles were not limiting.

33.     Messrs. Rourke, Scardino, Johnson, and Connor never disclosed to the PTO

EON's inconsistent position before the Court that its claimed invention was not limited to an

IVDS/interactive video system.  This position was material to EON's argument that the claimed

invention was not obvious and patentable.  Indeed, the PTO found that certain claims of the '101

and '546 patents were not obvious based on EON's position that it would not have been obvious

to combine, and there was no motivation to combine, the prior art Cunningham reference with the Morales-Garza or Martinez prior art references due to an alleged incompatibility between the Morales-Garza and Martinez IVDS system and Cunningham's IMTS system.  And in the '101 patent reexamination, where claims 19 and 20 still stand rejected, on July 9, 2010, a second declaration was submitted by Dr. Jay Kesan, which again takes the position that these claims are patentable and nonobvious due to the inability to combine Cunningham's IMTS system with the Martinez '177 patent.  EON's inconsistent position before the Court refuted its position before the PTO—and the PTO's ultimate finding of patentability—that Morales-Garza and Martinez were in different fields, and incompatible with, Cunningham, such that the claimed invention was not obvious and there was no motivation to combine.

34.     The constructions of "milliwatt power," "low power," and "limited power": During the PTO reexaminations, Mr. Rourke submitted an October 7, 2009 declaration to the PTO from Dr. Jay Kesan, who opined that the scope of "milliwatt power" in the asserted claims was at least less than two (2) Watts in order to distinguish the Martinez '036 prior art reference. Before the Court, however, EON took the position during claim construction that "milliwatt power" (and the related terms "low power" and "limited power") do not require construction at all and, alternatively, that these terms referred to a power of at least twenty (20) Watts.  Thus, EON's position before the Court was contrary to its position before the PTO that these terms were at least less than two (2) Watts and was directly relevant to EON's argument distinguishing Martinez '036, and material to EON's patentability argument before the PTO.

35.     The constructions of "mobile" and "portable":  During the PTO reexaminations, EON took the position before the PTO that these terms referred to subscriber units that were capable of movement from one cell subdivision to another cell subdivision while operable and in

communication with the IVDS system, and being handed off from one subdivision to another subdivision.  Before the Court, however, EON took the position that these terms do not require construction, and that stationary devices such as vending machines and meters are "portable" and "mobile."  EON's position to the Court directly contradicted its position before the PTO distinguishing the prior art, and was material to its patentability argument before the PTO.

36.     The construction of "synchronously related":  Before the PTO, to distinguish the Martinez '177 patent prior art reference, EON took the position that "synchronously related" referred to and required synchronization in time, and that this limitation was not met by Martinez '177, which EON asserted only disclosed frequency synchronization by use of different frequency channels.  Before the Court, however, EON took the position that "synchronously related" does not require construction and broadly means synchronized in time and/or frequency, contradicting its position before the PTO that synchronization in time is required unlike Martinez '177.  EON's position before the Court directly contradicted its patentability argument regarding Martinez '177 before the PTO and was material to its patentability argument before the PTO.

37.     The construction of "network hub switching center means":  Before the PTO, to distinguish the Martinez '036 and Cunningham prior art references, EON took the position that these references did not teach "network hub switching center means," including that Cunningham's IMTS telephone switch was not a "network hub switching center."  Before the Court, however, in response to Sensus's position that this "means" was indefinite, EON took the position that this "means" does not require construction because a "network hub switch" was known in the art and comprised an IMTS telephone switch, contrary to EON's position before the PTO.  EON's position before the Court contradicted its argument distinguishing Martinez '036 and Cunningham, including whether the claimed invention was obvious and whether there

was any motivation to combine these references with an IVDS or interactive video network system, and was material to EON's patentability argument before the PTO.  Further, EON's failure to disclose the parties' position in litigation on the construction of this term prevented the PTO from having material information on whether this "means" was a § 112 ¶ 6 term and whether this "means" was definite as required by § 112 ¶ 2.'

38.     The construction of "data processing means at the base station":  Before the PTO, to overcome a rejection based on the Martinez '036 patent, EON took the position that "data processing means at the base station" was not satisfied by an X.25 data packetizer such as disclosed by Martinez, which EON asserted was inoperable with its claimed invention.  Before the Court, however, in response to Sensus's position that this "means" was indefinite, EON took the position that this "means" was a data packetizer such as an X.25 packetizer—contrary to its position before the PTO distinguishing Martinez '036.  EON's position before the Court contradicted its argument distinguishing Martinez '036, and was material to its patentability argument before the PTO.  Further, EON's failure to disclose the parties' position in litigation on the construction of term prevented the PTO from having material information on whether this "means" was a § 112 ¶ 6 term and whether this "means" was definite as required by § 112 ¶ 2.

39.     None of this material information that EON's prosecution and litigation counsel failed to disclose was cumulative of other information presented to the PTO.  No substitute was presented to the PTO for the parties' claim construction briefing, or the Court's provisional claim construction order determining the scope of the claims and contradicting some of the PTO's findings while adopting many of EON's litigation positions.  Further, although the PTO ultimately relied on the alleged non-obviousness and inability to combine Cunningham with Martinez or Morales-Garza when finding at least some claims patentable, the other positions

EON took on construction of claim terms such as milliwatt power/low power/limited power, portable/mobile, synchronously related, network hub switching center means, and base station data processing and transmission means were all related to elements of the claimed invention and dispositive of the patentability of certain claims.  As a result, all of these failures to disclose by Messrs. Rourke, Scardino, Johnson, and Connor were material, as stated by MPEP 2001.05, 2001.06, and 2001.06(c) and 37 C.F.R. § 1.56.  Sensus incorporates by reference and refers to the parties' claim construction briefing on the claim terms discussed above, including in particular Sensus's supplemental claim construction brief regarding statements made by EON to the PTO during reexamination and the argument transcript from the *Sensus* case Markman hearing identifying EON's inconsistent positions taken on the construction of certain claim terms before the PTO during reexamination.  Sensus also incorporates by reference and refers to EON's office action responses in the '101 and '546 patent reexaminations and the October 7, 2009 and July 9, 2010 declarations of Dr. Kesan submitted to the PTO.

40.     EON's failure to disclose the material information discussed above was intentional.  EON failed to disclose and withheld this material information in the '546 and '101 reexaminations even though in the *Sensus* case, the claim construction process began as early as December 22, 2009 (with P.R. 4-1 disclosures); EON filed its opening claim construction brief on April 23, 2010; the parties completed claim construction briefing and related summary judgment briefing by May 28, 2010; and the Markman hearing occurred on June 10, 2010.  Further, in the *Verizon* case, the claim construction process began even earlier, with the Markman hearing on March 3, 2010, and the court's provisional claim construction order on May 17, 2010.  Notwithstanding these events, EON failed to disclose relevant, material claim construction information in the '101 or '546 reexaminations, as discussed above.  Further,

Sensus sent EON's litigation counsel a letter on June 3, 2010, asking EON to submit all relevant claim construction material to the PTO, including the Court's provisional claim construction order. EON's litigation and prosecution counsel have failed to take any steps in response to Sensus's request, further demonstrating that the failure of Messrs. Rourke, Scardino, Johnson and Connor to disclose this material information to the PTO is intentional and deliberate. This intent is further shown by EON's failure, to date, to request that the PTO withdraw its notice of intent (NOI) to issue a reexamination certificate in the '546 patent reexamination, or to otherwise move for consideration of this information by the PTO, so that the PTO can consider this material information from the *Verizon* and *Sensus* cases. This intent is also demonstrated by EON's litigation counsel's negotiation of the protective order in this case, including provisions related to the disclosure of confidential information to the PTO. From these conferences regarding the protective order, EON's litigation counsel demonstrated and asserted its duty to disclose material information to the PTO—including even Sensus confidential information. Nonetheless, Messrs. Rourke, Scardino, Johnson and Connor have not submitted this material to the PTO, demonstrating their intent not to do so. This intent is further demonstrated by the material inconsistencies between the positions EON has taken before the PTO versus the Court, and that EON's patents are substantially more likely to be rejected and found invalid during reexamination if the PTO is aware of, and able to consider, the parties' claim construction positions before the Court—including in particular EON's litigation positions that were contrary to its positions and patentability arguments before the PTO—as well as Sensus's and Verizon's invalidity and claim construction positions.

**EIGHTH DEFENSE**

41.     The '101 and '546 patents are unenforceable because of inequitable conduct in their procurement and during reexamination of those patents.  The duty of candor and good faith dealing with the PTO was violated in that material references of which EON was aware, were withheld from the PTO or buried among hundreds of references with an intent to deceive the PTO.  Contrary to MPEP 2001.04, 2001.05, 2001.06(b), and 37 C.F.R. § 1.56, EON, including its prosecuting attorneys Christopher Rourke and the law firm of Jackson Walker LLP; EON's litigation counsel, including Daniel Scardino, Jeff Johnson, Cab Connor, and the law firm of Reed & Scardino; and others substantively involved with the prosecution of the patents-in-suit including Alfonso Barrigan (collectively, "the EON attorneys and principals"), failed to notify the PTO about material references related to the EON patents-in-suit during prosecution and either failed to notify the PTO about the same references or buried them among hundreds in a dump of references to the PTO during reexamination.  Further, during reexamination of the EON patents-in-suit, EON, including its prosecution counsel Mr. Rourke, made arguments to the PTO that contradict the teachings of the withheld references.

42.     During reexamination of the '101 patent (SN 90/010,383) and the '546 patent (SN 90/010,382), the EON attorneys and principals either failed to disclose to the PTO or buried among hundreds of references submitted on a lengthy information disclosure statement material references including U.S. Patent No. 5,291,554 ('554 patent), which issued from application number 932,257 filed on August 19, 1992 and was issued to Fernando Morales and assigned to TV Answer, Inc. on March 1, 1994, and U.S. Patent 5,392,353 ('353 patent), which issued from application number 932,241 filed on August 19, 1992 and was issued to Fernando Morales and assigned to TV Answer, Inc. on February 21, 1995.  With regard to the reexamination of the '101

patent, the EON attorneys and principals buried the '353 and '554 patents among hundreds of additional references in a lengthy IDS filed on February 19, 2010.  With regard to the reexamination of the '546 patent, the EON attorneys and principals failed to disclose the '353 and '554 patents altogether.  The applications that became the '353 and '554 patents were co-pending applications with those that became the EON patents-in-suit and were before different examiners.  The application that became the '353 patent was examined by Salvadore Cangialosi, and the application that became the '554 patent was examined by David C. Cain.  The EON patents-in-suit were both examined by Wellington Chin.

43.    The '353 and '554 patents are material to patentability of the EON patents-in-suit. Like the EON patents-in-suit, the '353 and '554 patents are both related to two-way interactive video networks.  The '353 patent, entitled "Interactive Satellite Broadcast Network" generally discloses a system and method for ensuring the privacy of point-to-point message communications in a network of interactive video stations interconnected by a broadcast network.  '353 patent at Abstract.  The '554 patent, entitled "Shared-Price Custom Video Rentals Via Interactive TV" generally discloses a two-way interactive wireless satellite video system and method for distributing movies and similar video programs from a central video program distribution center.  '554 patent at Abstract.

44.    The '353 and '554 patents are additionally material to patentability of the EON patents-in-suit because the topology of the interactive video networks disclosed in both patents are substantially similar to that disclosed in the EON patents-in-suit.  Except for the box labeled "remote receiver," Figure 1 of the EON patents-in-suit is practically identical to Figure 1 of the '353 patent and Figure 2 of the '554 patent.  All figures show local area repeater stations connected via satellite to a switch control center and regional and local service participants.  All

figures also show response units that connect via radio frequency to the local area repeater station and that have memory program and interaction.  The similarity in network topology illustrated in these figures clearly indicate a material relationship.

45.     The '353 and '554 patents are further material to patentability because they are both expressly based on the technology disclosed by U.S. Patent Nos. 4,591,906 ('906 patent) and 5,101,267 ('267 patent) (collectively, Morales-Garza Patents).  *See* '554 patent at 2:6–13; 4:37–44; '353 patent at 3:6–11; 3:22–28.  The EON patents-in-suit are likewise expressly based on the technology disclosed by the '906 and '267 patents.  *See* '101 patent at 5:12–13; 4:13–16; 1:22–27.

46.     The EON attorneys and principals' failure to disclose these references to the PTO or bury them among hundreds of other references was intentional.  Both the '353 and '554 patents were issued to Fernando Morales, a former employee of EON's predecessor-in-interest, TV Answer, Inc.  Furthermore, the applications that later became the '353 and '554 patents were filed August 19, 1992, well before the applications that eventually issued as the EON patents-in-suit, which applications were filed Oct. 26, 1992 and May 10, 1994.  Additionally, the '353 and '554 patents were both assigned to EON's predecessor-in-interest, TV Answer, Inc.  Thus, the EON attorneys and principals were both aware of the applications that became the '353 and '554 patents prior to filing the applications that became the EON patents-in-suit.  They also knew the applications that became the '353 and '554 patents were pending before the PTO at the same time that the applications that became the EON patents-in-suit were pending.  They also knew about the '353 and '554 patents when the EON patents-in-suit were reexamined.

47.     Nonetheless, with respect to the '546 patent, the EON attorneys and principals failed to disclose either application or patent to the PTO during prosecution and reexamination.

And, for the '101 patent, the EON attorneys and principals failed to disclose either application or patent to the PTO during prosecution and buried the patents among hundreds in a lengthy IDS submitted to the PTO during reexamination.  With regard to the approximately 400 documents EON submitted to the PTO, the examiner considered them "to at least the 'degree to which the party filing the information has explained the content and relevance of the information'" and in the same manner as other search results are considered. '101 Final Rejection at 3–4 (May 10, 2010).  For the '353 and '554 patents, EON provided no explanation of the content or relevance of the information; it merely listed the patents among hundreds of others.  *See* '101 Information Disclosure Statements dated Sept. 2, 2009 and February 19, 2010.  Furthermore, during reexamination, EON, including Mr. Rourke, argued to the PTO that U.S. Patent Nos. 4,591,906 and 5,101,267 could not be combined with other references because they teach only that "the TV receiver response units transmits r-f beeps, and not messages."  '101 Office Action Resp. at 35 (Oct. 7, 2009).  Mr. Rourke consistently and repeatedly argued that the Morales-Garza Patents taught only r-f beeps and that they could not be modified to provide messages.  *See, e.g.*, October 7, 2009 Decl. of Jay Kesan at 3 ("The "teachings of Morales-Garza could not be modified to provide anything other than a single r-f beep."); *id.* at 13 ("The Morales-Garza patents could not be modified to provide this element, as the Morales-Garza patents 1) only teach the use of individual r-f beeps, which are not a sequence of characters used to convey information or data."); *id.* at 16 ("Morales-Garza '906 teaches the use of r-f beeps and teaches away from the use of longer messages in order to increase the number of response units 8 that can be serviced."); *id.* at 19 ("The r-f beeps of Morales-Garza '267 are not disclosed or suggested as able to transmit any message data, address data, or other data that would be necessary to provide for two-way digital communications between two different subscriber units . . . .").  Being

persuaded by EON's argument, the PTO noted that the "prior art discussed below fails to teach,

among other features, that it would have been obvious to modify the 'r-f beep' into a variable

length, data message." '101 Final Rejection at 7 (May 10, 2010); '546 Notice of Intent to Issue a

Reexamination Certificate at 5 (May 11, 2010).

48.     While arguing to the PTO that Morales-Garza Patents were not capable of

conveying messages, the EON attorneys and principals withheld or buried the '353 and '554

patents, both of which teach the exchange of *messages* between subscriber units and the system,

using the teachings of the very Morales-Garza Patents EON argued *cannot* support message

transmission.  The '554 patent teaches that the "interactor feature 47 provides comprehensive

interaction with the data center 2 for exchange of *messages*, data and program software."  '554

patent at 4:65–68 (emphasis added).  The '554 patent also teaches that:

> In this interactive system environment, features particularly
> relevant to the present invention are the downloading of data and
> software programs 45, and the transaction billing and processing
> 46 features, which implicitly include the data center ability to
> communicate with individual subscribers 4 and vendors 7 with
> privacy assurance *message encryption*.

'554 patent at 5:24–30.  Similarly, the '353 patent teaches that the "data control center 2, thus

intercepts all outgoing interactive *messages* broadcast over local link (18, Fig. 3) and the wide

area satellite system 1, and reforms these interactive messages for transmission to a designated

reception station (7) in point-to-point communication." '353 patent at 3:16–21 (emphasis added).

The '353 patent additionally discusses the exchange of *messages* between subscribers and the

system.  *See, e.g.*, '353 patent at 4:21–25 ("Improved privacy of communicated messages . . . is

provided in the two-way, wireless, broadcast network for processing interactive payment

transactions between subscribers 4 and vendors 7A over satellite system 1."); *id.* at 4:42–45

("Appropriately programmed PIK encryption-decryption equipment together with access to the

secret PIK are necessary for receiving and sending secret messages broadcast over the satellite system 1."); *id.* at 6:20–22 ("Usual interactive messages may of course be encrypted in a conventional manner, if desired."); 6:65–68 (claiming a "message processing means at each of said stations for receiving and sending interactive communications for point-to-point transmission between stations in said network"); *id.* at 2:25–39 ("It is a more specific objective of the invention to produce point-to-point communications broadcast via satellite without identifying messages, participants, transactions, or payment sources."); *id.* at 2:31–32 ("This invention provides improved privacy of communicated messages and participants . . . ."). The EON attorneys and principals' conduct in withholding or attempting to bury the '353 and '554 patents (and applications relating thereto) violated the duty of candor under 37 C.F.R. § 1.56 and constitutes inequitable conduct.

## <u>NINTH DEFENSE</u>

49.     The '101 and '546 patents are unenforceable because of inequitable conduct in their procurement and during reexamination of those patents. The duty of candor and good faith dealing with the PTO was violated in that material references of which EON was aware, were withheld from the PTO during prosecution of those patents. Contrary to MPEP 2001.04, 2001.05, 2001.06, and 37 C.F.R. § 1.56, EON, including the named inventor of the '101 and '546 patents Mr. Gilbert Dinkins and EON's prosecuting attorney Mr. Patrick King, failed to notify the PTO about material references related to the EON patents-in-suit during prosecution.

50.     The named inventor of the '101 and '546 patents, Mr. Dinkins, is also a named inventor on other patents including U.S. Patent No. 4,659,878 ("the '878 patent"), which Mr. Dinkins applied for on September 11, 1985 while he was employed by General Electric Company, and which is assigned to General Electric. The '878 patent is titled, "Method and

Apparatus for Interference Free Communications Between a Remote Handset and a Host

Subscriber Unit in a Cellular Radio Telephone System," and falls within the same general two-

way wireless communications technology field as EON's '101 and '546 patents-in-suit.  During

his June 14, 2010 deposition in the *Verizon* case, Mr. Dinkins testified about his General Electric

patent, including that this patent was a "cordless telephone extension for a mobile telephone,"

motivated by the problem of the limited power and interference of handheld telephones carried

by a person that were only able to transmit at approximately 600mW, compared to higher-power

mobile units found in a vehicle that could transmit at 3W.  According to Mr. Dinkins, his

patented General Electric invention allowed a person to make a call by transmitting that call

from a handheld telephone through the mobile unit, which acted as a wireless extension of the

handheld telephone, to the wireless system.  This transmission of wireless information through

the mobile unit enabled better coverage for the handheld device, which had a transmission power

that was less than the mobile unit.  (*See* June 14, 2010 Dinkins Dep. at 31−32.)  The '878 patent

itself similarly describes its purpose as reducing interference in a multi-tiered wireless

communication system, and discloses use of a repeater to relay a handset wireless transmission

from the handset to a base station cell site using a repeater (remote receiver) which, in that

patent, is disclosed to be a mobile subscriber unit.  (Dinkins '878 patent at Fig. 3 and, e.g.,

1:1−3:35; *see also id.* at Figs. 6 and 7 (describing call initiation by a handset and call

transmission to a handset via the mobile subscriber unit with a cellular system).  Mr. Dinkins

further testified at his June 14, 2010 deposition that the reason for the use of low-power

subscriber units and remote receivers in the '101 and '546 patents was to reduce interference

caused by subscriber unit transmissions with other devices.  (*Id.* at, e.g., 41−43.)  During

prosecution of the '101 patent (SN 07/966,414) and the '546 patent (SN 08/240,147), however,

Mr. Dinkins and the prosecuting attorney of those patents Mr. King failed to disclose the Dinkins '878 patent to the PTO.

51.     The '878 patent was a material prior art reference that a reasonable PTO examiner would consider pertinent to the patentability of the '101 and '546 patents, including, the novelty and nonobviousness of those patents.  Like the '101 and '546 patents, the '878 patent related to two-way wireless communication systems.  Further, the '878 patent was filed by the same inventor, Mr. Dinkins, as the '101 and '546 patents and disclosed numerous elements of the claimed invention, including, under EON's claim constructions and arguments regarding the scope of these patents:  mobile/portable subscriber units and handheld devices; low-power/limited power/"milliwatt-range" power subscriber units and handheld devices; a two-way wireless system for transmitting wireless information; and the implementation of a multi-tiered wireless communication system including use of a repeater or "remote receiver" to relay an otherwise low-powered/"milliwatt-range" power subscriber unit to a cellular or base station network.  The materiality of the '878 patent is further evident from the fact that EON has accused similar features of Sensus's FlexNet system, including the receipt and relay of a subscriber unit message to a base station network, as infringing the '101 and '546 patents. During prosecution of the '101 patent, the PTO only rejected the issued claims for their lack of definiteness under 35 U.S.C. § 112 ¶ 2 and not for lack of novelty under § 102 or obviousness under § 103(a).  Further, during prosecution of the '546 patent, the PTO rejected pending claims 1 and 35−47 as obvious based on U.S. Patent No. 5,177,604 to Martinez.  (Sept. 8, 1994 Office Action in SN 08/240,147, at 2.)  In response, Mr. King argued, "the Martinez reference does not disclose … [that] the subscriber unit transmits back to the cell site digital transmitter using a receive only digital receiver as set forth in the claims of the present invention."  (Dec. 6, 1994

Resp. to Office action in SN 08/240,147, at 4.)  Thus, Mr. King argued that the prior art record failed to disclose a remote receiver.  In response to this argument, and after the filing of a terminal disclaimer to overcome obviousness-type double patenting, the PTO deemed the claims patentable and issued a notice of allowance.  Given Mr. King's argument that the prior art of record did not disclose a remote receiver, the PTO would have considered it material that the named inventor, Mr. Dinkins, disclosed the same concept of using a remote receiver to relay a low-power subscriber unit message to a cellular base station as early as 1985, and was merely adapting that known prior art technique to the prior art IVDS systems referenced in the '101 and '546 patents, strongly indicating that the claimed inventions in the '101 and '546 patents were at least obvious, if not anticipated, and the PTO would have rejected the claims under § 102 and/or § 103(a).  Indeed, the disclosure of the '878 patent and Mr. Dinkins' testimony about that patent refute statements made in the specification of the '101 and '546 patents arguing the patentability of the claimed invention of those patents such as, for example, the statement that "[t]here has been no known interactive video data service system available heretofore that has the capability of servicing an assigned bas station area with subscriber units transmitting in the milliwatt range … ."  ('101 patent at 1:36−44.)  Further, Mr. Dinkins testified that he was the first person to invent a remote receiver, including a digital remote receiver, consistent with the specifications of the '101 and '546 patents.  (June 14, 2010 Dinkins Dep. at, *e.g.*, 152−154 and 160−161.)  However, Mr. Dinkins' General Electric '878 patent discloses that Mr. Dinkins publicly disclosed this idea as early as 1985.  Further, the Dinkins '878 patent itself refers U.S. Patent No. 3,906,166 to Cooper et al., stating that "although three tiered cellular radio telephone systems are well known, such as that disclosed in U.S. Pat. No. 3,906,166 to Cooper et al …" and indicating that multi-tiered wireless network systems using repeaters or remote receivers were well known

in the art.  Indeed, Sensus has asserted invalidity based on the Cooper reference, which also would have been brought to the PTO examiner's attention had the Dinkins '878 patent been disclosed.  A reasonable examiner would have considered Dinkins' own '878 patent, which discloses the known prior art technique or using a repeater or "remote receiver," including both in the '878 patent claimed invention itself, as well as by reference to the Cooper patent which Dinkins characterized as a "three tier system," as material to determining whether the '101 and '546 patent claimed inventions were novel and nonobvious.  The PTO examiner would have likely rejected the claims under § 102 and/or § 103(a) given Dinkins' own acknowledgement and disclosure of multi-tiered wireless and cellular systems using a remote receiver in the '878 patent and by reference to Cooper, and given the extensive references in the '101 and '546 patents referring to prior art IVDS systems and patents, including U.S. Patent No. 5,101,267 to Morales and 4,591,906 to Morales-Garza, as disclosing the remaining elements of the claimed invention other than a remote receiver, portable or mobile subscriber units, and low-power or "milliwatt-level" power subscriber units.

52.    Mr. Dinkins' failure to disclose the Dinkins '878 patent to the PTO was intentional.  Based on his deposition testimony, the specification of the '878 patent, and the specifications of the '101 and '546 patents, Mr. Dinkins knew that he was applying the same remote-receiver/repeater technique and idea in both the earlier '878 patent and the later '101 and '546 patents to retransmit and relay a low-power, milliwatt-level transmission from a subscriber unit to a base station network, including doing so in order to reduce interference.  Further, the disclosures of these patents and Mr. Dinkins' deposition testimony demonstrates that Mr. Dinkins was aware of the high materiality of the '878 patent to the '101 and '546 patent claimed invention.  Mr. Dinkins' intentional failure to disclose the '878 patent is also supported by

EON's arguments in the *Verizon* and *Sensus* cases, as well as Mr. Dinkins' own testimony, regarding the breadth of the '101 and '546 patents, including that these patents are not limited to IVDS or interactive video network systems having a video or television signal, and that the specification of those patents teach data telemetry applications such as vending, alarm monitoring, and meter reading.  Indeed, Mr. Dinkins testified that at the time the '101 and '546 patents were drafted, and before they were filed, he realized the broad applications for and multiple uses of the '101 and '546 patent claimed invention beyond television systems.  (June 14, 2010 Dinkins Dep. at 125−126.)  As such, Mr. Dinkins was aware of the high materiality and applicability of the '878 patent as prior art to the '101 and '546 patent, and his failure to disclose the '878 patent to the PTO was intentional.

## TENTH DEFENSE

53.     Sensus realleges and incorporates herein by reference the allegations in paragraphs 49−52 above.

54.     The '101 and '546 patents are unenforceable because of inequitable conduct in their procurement and during reexamination of those patents.  The duty of candor and good faith dealing with the PTO was violated in that material references of which EON was aware, were withheld from the PTO during prosecution of those patents.  Contrary to MPEP 2001.04, 2001.05, 2001.06, and 37 C.F.R. § 1.56, EON, including the named inventor of the '101 and '546 patents Mr. Gilbert Dinkins and EON's prosecuting attorney Mr. Patrick King, failed to notify the PTO about material references related to the EON patents-in-suit during prosecution, including U.S. Patent No. 3,906,166 to Cooper et al ("the Cooper patent").

55.     The Cooper patent is titled "Radio Telephone System," and discloses "a portable duplex radio telephone system for communicating with a plurality of mobile radio handsets.

(*See* Cooper patent at, e.g., abstract and Fig. 2.)  The Cooper reference discloses that the base station transmitter has a "predetermined transmission range" that is shorter than the transmission range of the portable or mobile units.  (*Id.*)  As a result, Cooper discloses the addition of "satellite receivers," (*id.*) which Cooper also expressly refers to as "remote receivers," (*see id.* at 3:41−43), in order to receive and relay the lower-power mobile/portable unit transmissions. Cooper further discloses that by the addition of these remote receivers, "the geographic area over which communications is to be provided is divided into a series of base station cells, and each station cell is subdivided into a series of sub-cells," with each sub-cell having one of the "satellite base station receivers … to receive signals from the portable transmitters."  (*Id.* at 2:5−23; *see also* Figs. 1a and 2 and 5:9−11:64.)  Cooper discloses these elements of the '101 and '546 patent claims and their embodiments, as well as other elements, as shown by Exhibit A.8 to Sensus's Invalidity Contentions, which is incorporated herein by reference.

56.    As discussed in paragraphs 39−52, the Dinkins '878 patent expressly refers to the Cooper patent, which the '878 patent describes as exemplary of "three tiered cellular radio telephone systems" that were "well known" as of September 11, 1985 when Dinkins filed his '878 patent.  Indeed, in his '878 patent, Dinkins discusses Cooper as exemplary of such systems having low-power wireless handset devices, stating:

> The use of remote wireless telephone handsets in wire line telephone service systems is well-known.  The remote handsets typically operate on RF channels below 50 MHz at power levels below 100 mw.  These instruments are sold in numerous retail store outlets and require no FCC frequency assignment. Accordingly, they usually fall on or near the same RF channel frequency, especially if they are manufactured and provided from a single supplier.
>
> As a result, an interference problem typically occurs between remote handsets and tends to degrade the service provided in proportion to the number of remote handsets operating in a given service area. A further interference problem exists in that the

> normally operating services in these frequency bands, i.e., TV,
> police, CB, utilities, etc., because of their higher power and larger
> populations, can render the remote sets virtually useless.  Thus, the
> use of remote handsets in conjunction with a host subscriber unit in
> a wireless cellular radio telephone system has up until now been
> assumed difficult to accomplish, in view of interference problems
> such as those above described with respect to the wireless remote
> handsets used in the context of wire-line systems.
>
> Accordingly, although three tiered cellular radio telephone systems
> are well known, such as that disclosed in U.S. Pat. No. 3,906,166
> to Cooper et al, a four tiered system using wireless remote handsets
> has up until now not been feasible.

(Dinkins '878 patent at 1:15−43.)  Thus, as of the filing of the '101 and '546 patents and during

their prosecution, Dinkins was aware of the Cooper patent.

57.    The Cooper patent was a material prior art reference that a reasonable PTO

examiner would consider pertinent to the patentability of the '101 and '546 patents, including the

novelty and nonobviousness of those patents.  Like the '101 and '546 patents, the Cooper patent

related to two-way wireless communication systems.  Further, the Cooper patent was referred to

and known by Mr. Dinkins, who characterized Cooper in his '878 patent as disclosing a three-

tier cellular system having portable/mobile subscriber units that transmit at power levels below

100mW.  The Cooper patent describes the exact same "problem" of receiving low-power

mobile/portable transmissions as the '101 and '546 patents, and presents the exact same solution:

subdivision of a base station geographic area, with the addition of satellite (remote) receivers in

these subdivisions that receive and relay low-power mobile/portable transmissions to the base

station cell site.  The Cooper patent even uses the same name for these satellite receivers as the

'101 and '546 patents—remote receivers.  (*See* Cooper patent at 3:41−43.)  Cooper anticipates or

renders obvious multiple claims of the '101 and '546 patents, as disclosed by Exhibit A.8 to

Sensus's Invalidity Contentions.  This materiality is further supported by Mr. Dinkins'

deposition testimony where, contrary to the Cooper patent, Mr. Dinkins testified that he was the

first person to invent a remote receiver, including a digital remote receiver, consistent with the specifications of the '101 and '546 patents. (June 14, 2010 Dinkins Dep. at, *e.g.*, 152−154 and 160−161.) Indeed, the disclosure of the Cooper patent refutes statements made in the specification of the '101 and '546 patents arguing the patentability of the claimed invention of those patents such as, for example, the statement that "[t]here has been no known interactive video data service system available heretofore that has the capability of servicing an assigned base station area with subscriber units transmitting in the milliwatt range … ." ('101 patent at 1:36−44.) Also, during prosecution of the '101 and '546 patents, the prosecuting attorney Mr. King argued that the claims were patentable over the prior art of record because that prior art, including in particular the Martinez '604 patent, did not disclose geographic subdivisions or use of a remote receiver, after which time the PTO allowed the claims. As a result, the Cooper patent was highly material to the prosecution and patentability of the '101 and '546 patents, was not cumulative of the prior art before the PTO, and contradicted the positions taken by Mr. King during prosecution. Had the Cooper patent been disclosed to the PTO during prosecution, the examiner would have realized that Dinkins was merely adapting the known prior art technique of using remote receivers to relay low-power transmissions from mobile/portable subscriber units as disclosed by Cooper, strongly indicating that the claimed inventions in the '101 and '546 patents were at least obvious, if not anticipated, and rejected the claims under § 102 and/or § 103(a). The PTO examiner would have likely rejected the claims under § 102 and/or § 103(a) given Cooper's disclosure of a remote receiver and the other elements of the claimed invention, and given the extensive references in the '101 and '546 patents referring to prior art IVDS systems and patents, including U.S. Patent No. 5,101,267 to Morales and 4,591,906 to Morales-

Garza, as disclosing any remaining elements of the claimed invention allegedly not disclosed by Cooper.

58.     Mr. Dinkins' failure to disclose the Cooper patent to the PTO was intentional. Based on his deposition testimony, the specification of the '878 patent, the specification of the Cooper patent, and the specifications of the '101 and '546 patents, Mr. Dinkins knew that he was applying the same remote-receiver/repeater technique and idea from the earlier Cooper patent in the later '101 and '546 patents to retransmit and relay a low-power, milliwatt-level transmission from a subscriber unit to a base station network.  Further, the disclosures of these patents and Mr. Dinkins' deposition testimony demonstrate that Mr. Dinkins was aware of the high materiality of the Cooper patent to the '101 and '546 patent claimed invention.  Due to the citation of Cooper in his '878 patent, Mr. Dinkins was aware of the Cooper patent.  Mr. Dinkins' intentional failure to disclose the '878 patent is also supported by EON's arguments in the *Verizon* and *Sensus* cases, as well as Mr. Dinkins' own testimony, regarding the breadth of the '101 and '546 patents, including that these patents are not limited to IVDS or interactive video network systems having a video or television signal, and that the specification of those patents teach data telemetry applications such as vending, alarm monitoring, and meter reading.  Indeed, Mr. Dinkins testified that at the time the '101 and '546 patents were drafted, and before they were filed, he realized the broad applications for and multiple uses of the '101 and '546 patent claimed invention beyond television systems.  (June 14, 2010 Dinkins Dep. at 125−126.)  As such, Mr. Dinkins was aware of the high materiality and applicability of the Cooper patent as prior art to the '101 and '546 patent, and his failure to disclose the Cooper patent to the PTO was intentional.

**ELEVENTH DEFENSE**

59.    The '101 and '546 patents are unenforceable because of inequitable conduct in their procurement and during reexamination of those patents.  The duty of candor and good faith dealing with the PTO was violated in that material references of which EON was aware, were withheld from the PTO during prosecution of those patents.  Contrary to MPEP 2001.04, 2001.05, 2001.06(a), and 37 C.F.R. § 1.56, EON, including its prosecuting attorney Mr. Patrick King, failed to notify the PTO about material references related to the EON patents-in-suit during prosecution.

60.    During prosecution of a PCT counterpart of the '101 and '546 patents, a PCT International Search Report identified U.S. Patent No. 4,928,177 to Martinez as a "Y" reference "of particular relevance" to the Dinkins invention disclosed by the '101 and '546 patents. Despite the high materiality of the Martinez '177 patent, Mr. King failed to disclose the Martinez '177 patent to the PTO during prosecution of the '101 and '546 patents.  The Martinez '177 patent was material, as supported by the PCT search report, as well as the reexaminations of the '101 and '546 patents, in which the PTO granted reexamination of the '101 and '546 patents based on the Martinez '177 patent, initially rejected all of the '101 patent claims and claims 1−12 and 14 of the '546 patent as obvious based on Martinez; and issued final rejections of '101 patent claims 19 and 20 for obviousness based on the Martinez '177 patent.  Further, Mr. King's failure to disclose the Martinez '177 patent was intentional, as supported by Mr. King's failure to provide a credible explanation at his deposition for this failure to disclose, and his testimony that it was routine for him to submit prior art such as the Martinez '177 patent identified in PCT search reports including those identified as relevant in the search report.  The materiality of and Mr. King's intentional failure to disclose the Martinez '177 patent is further supported by EON's

practice during reexamination of the '101 and '546 patents-in-suit, during which EON has submitted hundreds of references and other litigation-related documents regarding the '101 and '546 patents.  As such, Mr. King's failure to submit the Martinez '177 patent to the PTO is contrary to EON's prior course of conduct and demonstrates that the Martinez '177 patent was material and the failure to disclose it was intentional.  In support of this defense, Sensus further incorporates by reference and refers to Verizon's Motion for Summary Judgment of Unenforceability, Docket No. 396 in the *Verizon* case.

## COUNTERCLAIMS

Defendant and Counterclaim Plaintiff Sensus USA Inc., formerly known as Sensus Metering Systems Inc., for its counterclaims against Plaintiff and Counterclaim Defendant EON, alleges as follows:

61.     Defendant and Counterclaim Plaintiff Sensus USA Inc. is a Delaware corporation, having its principal place of business at 8537 Six Forks Road, Suite 400.

62.     Upon information and belief, Plaintiff and Counterclaim Defendant EON is a Texas limited liability company with its registered office located at 110 North College, 500 Plaza Tower, Tyler, Texas 75702.

63.     In its Complaint, Plaintiff EON avers that it owns all rights, title and interest in the patents-in-suit.

64.     Under 28 U.S.C. §1338(a), this Court has subject matter jurisdiction over these counterclaims for declaratory judgment, brought pursuant to the Federal Declaratory judgment Act, 28 U.S.C. §§ 2201 and 2202.  Venue for this counterclaim is proper under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

65      Based on EON's allegations of infringement, the Complaint EON filed against Sensus, and prior litigation by EON involving one or more of the patents-in-suit, a justiciable actual controversy exists between Sensus and the Counterclaim Defendant EON concerning the alleged infringement, validity, and enforceability of the '101 Patent and the '546 Patent.

## FIRST COUNTERCLAIM

### (Declaratory Judgment of Noninfringement)

66.     Sensus realleges and incorporates herein by reference the allegations in paragraphs 18-65 above.

67.     Sensus has not infringed and is not infringing (either directly, contributorily, or by inducement) any claim of the patents-in-suit.

68.     Because there exists a real and justiciable controversy between the parties regarding infringement of the '101 Patent and the '546 Patent, this Court should make declarations that Sensus does not infringe the '101 Patent and the '546 Patent.

## SECOND COUNTERCLAIM

### (Declaratory Judgment of Invalidity)

69.     Sensus realleges and incorporates herein by reference the allegations in paragraphs 18-68 above.

70.     The '101 Patent and the '546 Patent are void and invalid for failure to comply with the requirements of Title 35, united States Code, including, but not limited to, Sections 102, 103 and/or 112.

71.     Because there exists a real and justiciable controversy between the parties regarding the validity of the '101 Patent and the '546 Patent, this Court should make declarations that the '101 Patent and the '546 Patent are invalid.

## THIRD COUNTERCLAIM

### (Declaratory Judgment of Unenforceability)

72.     Sensus realleges and incorporates herein by reference the allegations in paragraphs 18-71 above.

73.     The '101 Patent and the '546 Patent are unenforceable due to EON's inequitable conduct before the PTO during reexamination of those patents.

74.     The '101 and '546 patents are unenforceable because of inequitable conduct in their procurement and during reexamination of those patents.  The duty of candor and good faith dealing with the PTO was violated in that material information, including information about on-going litigation involving the patents-in-suit, intentionally was not disclosed to the PTO with an intent to deceive the PTO.  Contrary to MPEP 2001.04, 2001.05, 2001.06(c), and 37 C.F.R. § 1.56, EON, including its prosecuting attorneys Christopher Rourke and the law firm of Jackson Walker LLP; EON's litigation counsel, including Daniel Scardino, Jeff Johnson, Cab Connor, and the law firm of Reed & Scardino; and others substantively involved with the prosecution of the patents-in-suit including Alfonso Barrigan (collectively, "the EON attorneys and principals"), did not notify the PTO about material information related to the ongoing litigations of the EON patents, including from *EON Corp. IP Holdings, LLC v. Verizon Clinton Center Drive Corp et al.*, 6:08-cv-00385-LED-JDL ("the *Verizon* case") and *EON Corp. IP Holdings, LLC v. Sensus USA Inc.*, 6:09-cv-00116-LED-JDL ("the *Sensus* case").

75.     During reexamination of the '101 patent (SN 90/010,383) and the '546 patent (SN 90/010,382), the EON attorneys and principals failed to disclose to the PTO and withheld from the PTO material information from these cases regarding the parties' claim construction positions on the scope of the claims of the EON patents.  For the '101 and '546 patent

reexaminations, this material information includes: Sensus's claim construction and summary judgment of indefiniteness briefing and EON's responses to that briefing; the Markman hearing transcripts from the *Verizon* and *Sensus* cases; the Court's May 17, 2010 Order in the *Verizon* case provisionally construing certain disputed claim terms from the '101 and '546 patents; and the parties' P.R. 4-1, P.R. 4-2, P.R. 4-3, and P.R. 4-5(d) disclosures and statements related to claim construction and EON's claim construction positions.  For the '546 patent reexamination, this material information further includes: Verizon's summary judgment of indefiniteness briefing, EON's response to Verizon's summary judgment of indefiniteness briefing, and Verizon's reply in support of its summary judgment of indefiniteness; and EON's reply claim construction brief.

76.     During the '101 and '546 patent reexaminations, Mr. Rourke filed information disclosure statements (IDS) on June 18, 2009 and September 2, 2009, in which the EON attorneys submitted prior art, pleadings, and other documents (including its complaint, defendants' answers, and infringement and invalidity contentions) from the *Verizon* litigation. Additionally, Mr. Rourke submitted an additional IDS on November 2, 2009 in the '101 and '546 patent reexaminations disclosing EON's infringement contentions against Sensus.  And in the '101 patent reexamination—but not the '546 patent reexamination— Mr. Rourke submitted a February 19, 2010 IDS disclosing EON's opening claim construction brief from the *Verizon* case and Verizon's responsive claim construction brief, and Verizon's and EON's patent rule claim construction disclosures.

77.     The submission of these IDS forms demonstrate that EON's reexamination counsel (and principals), including Mr. Rourke and Jackson Walker, were aware of the *Verizon*

and *Sensus* cases and EON's duty to submit material information from these litigations to the

PTO, as required by MPEP 2001.06(c), which recites:

> Where the subject matter for which a patent is being sought is or
> has been involved in litigation, the existence of such litigation and
> any other material information arising therefrom must be brought
> to the attention of the U.S. Patent and Trademark Office.
> Examples of such material information include evidence of
> possible prior public use or sales, questions of inventorship, prior
> art, allegations of "fraud," "inequitable conduct," and "violation of
> duty of disclosure."  Another example of such material information
> is any assertion that is made during litigation which is
> contradictory to assertions made to the examiner.  Environ Prods.,
> Inc. v. Total Containment, Inc., 43 USPQ2d 1288, 1291 (E.D. Pa.
> 1997).  Such information might arise during litigation in, for
> example, pleadings, admissions, discovery including
> interrogatories, depositions, and other documents and testimony.

Based on their conduct before the PTO, Mr. Rourke and Jackson Walker were aware of EON's

obligation under MPEP 2001.06(c) and 37 C.F.R. § 1.56 as shown by their submission of

documents to the PTO such as orders of dismissal with respect to certain defendants, and their

practice earlier in the reexaminations of submitting all pleadings, prior art, discovery, and

contentions from the *Verizon* case in the June 18, 2009 and September 2, 2009 IDS forms.

Further, any reasonable prosecuting attorney, including Mr. Rourke, would be aware of the

obligations of MPEP 2001.06(c), as well as MPEP 2001.04 and 2001.05.  These IDS forms also

demonstrate that EON's prosecution counsel Mr. Rourke and Jackson Walker were in

communication with EON's litigation counsel, including Messrs. Scardino, Johnson, Connor,

and the Reed & Scardino firm, and that EON's litigation counsel were aware of the pending

reexaminations.  Indeed, Verizon and Sensus raised statements made by EON during

reexamination during the claim construction briefing in the *Verizon* and *Sensus* cases.  Further,

Messrs. Scardino, Johnson, and Connor were part of the Jackson Walker firm until shortly before

the *Verizon* claim construction hearing and were aware of both the ongoing litigations and the patent reexaminations.

78.     Mr. Rourke failed to submit all relevant and material claim construction information from the *Verizon* and *Sensus* cases to the PTO.  In the '101 patent reexamination, Mr. Rourke did not submit any of the following to the PTO: (1) the parties' patent rule disclosures from the *Verizon* or *Sensus* cases; (2) Verizon's reply claim construction brief, Sensus's claim construction briefing and EON's responsive briefing, and Sensus and Verizon's summary judgment of indefiniteness briefing and EON's responsive briefing; (3) the transcripts from the March 3, 2010 or June 10, 2010 Markman hearings in the *Verizon* or *Sensus* cases; (4) the Court's May 17, 2010 provisional Markman order; (5) Sensus's and EON's supplemental Markman briefing regarding EON's statements made during reexamination; and (6) the defendants' motions for reconsideration and objections to the Court's provisional Markman order and EON's responses to those motions and objections.  In the '546 patent reexamination, Mr. Rourke did not submit any of the following to the PTO: (1) Sensus's and EON's patent rule disclosures from the *Sensus* cases; (2) Sensus's, Verizon's, and EON's claim construction and summary judgment of indefiniteness briefing from the *Sensus* and *Verizon* cases; (3) the transcripts from the March 3, 2010 or June 10, 2010 Markman hearings in the *Verizon* or *Sensus* cases; (4) the Court's May 17, 2010 provisional Markman order; (5) Sensus's and EON's supplemental Markman briefing regarding EON's statements made during reexamination; and (6) the defendants' motions for reconsideration and objections to the Court's provisional Markman order and EON's responses to those motions and objections.  Due to the awareness by litigation counsel of the reexaminations and communications with Mr. Rourke, and their involvement with the claim construction briefing in the *Verizon* and *Sensus* cases, Messrs.

Scardino, Johnson and Connor also failed to submit to the PTO these materials, notwithstanding their duty to provide this information to the PTO.

79.     This information that was not disclosed to and withheld from the PTO was material because it disclosed positions and arguments taken by EON, Sensus, and Verizon related to the scope, patentability, and validity of the '101 and '546 patent claims, including positions and arguments that were inconsistent with and contradicted those taken by EON and the PTO during the '101 and '546 patent reexaminations, or that were never raised during these reexaminations.  *See* MPEP 2001.05, 2001.06, and 2001.06(c).  This material information included information identified in paragraphs 80 – 88.

80.     <u>The scope and validity of claims having § 112 ¶ 6 elements:</u>  The claims of the '101 and '546 patents include many elements reciting "means for" performing a function that presumptively fall under § 112 ¶ 6.  During the *Verizon* and *Sensus* cases, Sensus and Verizon took positions that these terms fell under § 112 ¶ 6, and that many of these claim terms were indefinite for the specification's failure to disclose corresponding structure for these terms. Sensus and Verizon also took the position that the § 112 ¶ 6 presumption could not be overcome due to applicable law requiring the claim alone to clearly disclose structure for performing the recited § 112 ¶ 6 function (*e.g.*, base station reception means; reception means; network hub switching center means).  Sensus and Verizon's positions, and EON's responses to those positions, directly relate to the validity of EON's patents under § 112 ¶¶ 2 and 6.  During the reexaminations, the PTO held that all of the "means" terms overcame the § 112 ¶ 6 presumption. However, Messrs. Rourke, Scardino, Johnson, and Connor never disclosed to the PTO defendants' positions, as well as EON's own positions, on this issue in the *Verizon* and *Sensus* cases, including EON's position that certain of the "means" terms were § 112 ¶ 6 limitations, e.g.

base station reception means.  Had the PTO been aware of those positions, the PTO might have found that certain § 112 ¶ 6 terms were indefinite and invalid.  Indeed, the Court found in its provisional claim construction order that at least some "means" were subject to § 112 ¶ 6, contrary to the PTO examiner's determination during reexamination.

81.     <u>The obviousness of the asserted claims under § 103:</u>  EON took the position before the PTO that it would not have been obvious to combine the prior art Cunningham reference with the Morales-Garza or Martinez prior art references, disputing the PTO's position that there was a motivation to combine these prior art references.  The PTO had taken the position that all of these prior art references were in the same field of endeavor—two-way radio communications—which EON disputed by characterizing Cunningham as an IMTS system that allegedly was incompatible with an IVDS/interactive video system such as Morales-Garza or Martinez.

82.     Before the Court during claim construction, however, EON took the position that its claimed invention, which referred to Morales-Garza and Martinez for support, was not limited to an IVDS/interactive video system—and, instead, took the position that its claimed invention was generally in the field of two-way radio communications, arguing that its invention could not include or require video due to FCC IVDS bandwidth transmission limitations, and that the claim preambles were not limiting.

83.     Messrs. Rourke, Scardino, Johnson, and Connor never disclosed to the PTO EON's inconsistent position before the Court that its claimed invention was not limited to an IVDS/interactive video system.  This position was material to EON's argument that the claimed invention was not obvious and patentable.  Indeed, the PTO found that certain claims of the '101 and '546 patents were not obvious based on EON's position that it would not have been obvious

to combine, and there was no motivation to combine, the prior art Cunningham reference with the Morales-Garza or Martinez prior art references due to an alleged incompatibility between the Morales-Garza and Martinez IVDS system and Cunningham's IMTS system.  And in the '101 patent reexamination, where claims 19 and 20 still stand rejected, on July 9, 2010, a second declaration was submitted by Dr. Jay Kesan, which again takes the position that these claims are patentable and nonobvious due to the inability to combine Cunningham's IMTS system with the Martinez '177 patent.  EON's inconsistent position before the Court refuted its position before the PTO—and the PTO's ultimate finding of patentability—that Morales-Garza and Martinez were in different fields, and incompatible with, Cunningham, such that the claimed invention was not obvious and there was no motivation to combine.

84.     The constructions of "milliwatt power," "low power," and "limited power":  During the PTO reexaminations, Mr. Rourke submitted an October 7, 2009 declaration to the PTO from Dr. Jay Kesan, who opined that the scope of "milliwatt power" in the asserted claims was at least less than two (2) Watts in order to distinguish the Martinez '036 prior art reference.  Before the Court, however, EON took the position during claim construction that "milliwatt power" (and the related terms "low power" and "limited power") do not require construction at all and, alternatively, that these terms referred to a power of at least twenty (20) Watts.  Thus, EON's position before the Court was contrary to its position before the PTO that these terms were at least less than two (2) Watts and was directly relevant to EON's argument distinguishing Martinez '036, and material to EON's patentability argument before the PTO.

85.     The constructions of "mobile" and "portable":  During the PTO reexaminations, EON took the position before the PTO that these terms referred to subscriber units that were capable of movement from one cell subdivision to another cell subdivision while operable and in

communication with the IVDS system, and being handed off from one subdivision to another subdivision.  Before the Court, however, EON took the position that these terms do not require construction, and that stationary devices such as vending machines and meters are "portable" and "mobile."  EON's position to the Court directly contradicted its position before the PTO distinguishing the prior art, and was material to its patentability argument before the PTO.

86.     The construction of "synchronously related":  Before the PTO, to distinguish the Martinez '177 patent prior art reference, EON took the position that "synchronously related" referred to and required synchronization in time, and that this limitation was not met by Martinez '177, which EON asserted only disclosed frequency synchronization by use of different frequency channels.  Before the Court, however, EON took the position that "synchronously related" does not require construction and broadly means synchronized in time and/or frequency, contradicting its position before the PTO that synchronization in time is required unlike Martinez '177.  EON's position before the Court directly contradicted its patentability argument regarding Martinez '177 before the PTO and was material to its patentability argument before the PTO.

87.     The construction of "network hub switching center means":  Before the PTO, to distinguish the Martinez '036 and Cunningham prior art references, EON took the position that these references did not teach "network hub switching center means," including that Cunningham's IMTS telephone switch was not a "network hub switching center."  Before the Court, however, in response to Sensus's position that this "means" was indefinite, EON took the position that this "means" does not require construction because a "network hub switch" was known in the art and comprised an IMTS telephone switch, contrary to EON's position before the PTO.  EON's position before the Court contradicted its argument distinguishing Martinez '036 and Cunningham, including whether the claimed invention was obvious and whether there

was any motivation to combine these references with an IVDS or interactive video network system, and was material to EON's patentability argument before the PTO.  Further, EON's failure to disclose the parties' position in litigation on the construction of this term prevented the PTO from having material information on whether this "means" was a § 112 ¶ 6 term and whether this "means" was definite as required by § 112 ¶ 2.'

88.   The construction of "data processing means at the base station":  Before the PTO, to overcome a rejection based on the Martinez '036 patent, EON took the position that "data processing means at the base station" was not satisfied by an X.25 data packetizer such as disclosed by Martinez, which EON asserted was inoperable with its claimed invention.  Before the Court, however, in response to Sensus's position that this "means" was indefinite, EON took the position that this "means" was a data packetizer such as an X.25 packetizer—contrary to its position before the PTO distinguishing Martinez '036.  EON's position before the Court contradicted its argument distinguishing Martinez '036, and was material to its patentability argument before the PTO.  Further, EON's failure to disclose the parties' position in litigation on the construction of term prevented the PTO from having material information on whether this "means" was a § 112 ¶ 6 term and whether this "means" was definite as required by § 112 ¶ 2.

89.   None of this material information that EON's prosecution and litigation counsel failed to disclose was cumulative of other information presented to the PTO.  No substitute was presented to the PTO for the parties' claim construction briefing, or the Court's provisional claim construction order determining the scope of the claims and contradicting some of the PTO's findings while adopting many of EON's litigation positions.  Further, although the PTO ultimately relied on the alleged non-obviousness and inability to combine Cunningham with Martinez or Morales-Garza when finding at least some claims patentable, the other positions

EON took on construction of claim terms such as milliwatt power/low power/limited power, portable/mobile, synchronously related, network hub switching center means, and base station data processing and transmission means were all related to elements of the claimed invention and dispositive of the patentability of certain claims.  As a result, all of these failures to disclose by Messrs. Rourke, Scardino, Johnson, and Connor were material, as stated by MPEP 2001.05, 2001.06, and 2001.06(c) and 37 C.F.R. § 1.56.  Sensus incorporates by reference and refers to the parties' claim construction briefing on the claim terms discussed above, including in particular Sensus's supplemental claim construction brief regarding statements made by EON to the PTO during reexamination and the argument transcript from the *Sensus* case Markman hearing identifying EON's inconsistent positions taken on the construction of certain claim terms before the PTO during reexamination.  Sensus also incorporates by reference and refers to EON's office action responses in the '101 and '546 patent reexaminations and the October 7, 2009 and July 9, 2010 declarations of Dr. Kesan submitted to the PTO.

90.     EON's failure to disclose the material information discussed above was intentional.  EON failed to disclose and withheld this material information in the '546 and '101 reexaminations even though in the *Sensus* case, the claim construction process began as early as December 22, 2009 (with P.R. 4-1 disclosures); EON filed its opening claim construction brief on April 23, 2010; the parties completed claim construction briefing and related summary judgment briefing by May 28, 2010; and the Markman hearing occurred on June 10, 2010. Further, in the *Verizon* case, the claim construction process began even earlier, with the Markman hearing on March 3, 2010, and the court's provisional claim construction order on May 17, 2010.  Notwithstanding these events, EON failed to disclose relevant, material claim construction information in the '101 or '546 reexaminations, as discussed above.  Further,

Sensus sent EON's litigation counsel a letter on June 3, 2010, asking EON to submit all relevant claim construction material to the PTO, including the Court's provisional claim construction order.  EON's litigation and prosecution counsel have failed to take any steps in response to Sensus's request, further demonstrating that the failure of Messrs. Rourke, Scardino, Johnson and Connor to disclose this material information to the PTO is intentional and deliberate.  This intent is further shown by EON's failure, to date, to request that the PTO withdraw its notice of intent (NOI) to issue a reexamination certificate in the '546 patent reexamination, or to otherwise move for consideration of this information by the PTO, so that the PTO can consider this material information from the *Verizon* and *Sensus* cases.  This intent is also demonstrated by EON's litigation counsel's negotiation of the protective order in this case, including provisions related to the disclosure of confidential information to the PTO.  From these conferences regarding the protective order, EON's litigation counsel demonstrated and asserted its duty to disclose material information to the PTO—including even Sensus confidential information.  Nonetheless, Messrs. Rourke, Scardino, Johnson and Connor have not submitted this material to the PTO, demonstrating their intent not to do so.  This intent is further demonstrated by the material inconsistencies between the positions EON has taken before the PTO versus the Court, and that EON's patents are substantially more likely to be rejected and found invalid during reexamination if the PTO is aware of, and able to consider, the parties' claim construction positions before the Court—including in particular EON's litigation positions that were contrary to its positions and patentability arguments before the PTO—as well as Sensus's and Verizon's invalidity and claim construction positions.

91.    The '101 and '546 patents are unenforceable because of inequitable conduct in their procurement and during reexamination of those patents.  The duty of candor and good faith

dealing with the PTO was violated in that material references of which EON was aware, were withheld from the PTO or buried among hundreds of references with an intent to deceive the PTO.  Contrary to MPEP 2001.04, 2001.05, 2001.06(b), and 37 C.F.R. § 1.56, EON, including its prosecuting attorneys Christopher Rourke and the law firm of Jackson Walker LLP; EON's litigation counsel, including Daniel Scardino, Jeff Johnson, Cab Connor, and the law firm of Reed & Scardino; and others substantively involved with the prosecution of the patents-in-suit including Alfonso Barrigan (collectively, "the EON attorneys and principals"), failed to notify the PTO about material references related to the EON patents-in-suit during prosecution and either failed to notify the PTO about the same references or buried them among hundreds in a dump of references to the PTO during reexamination.  Further, during reexamination of the EON patents-in-suit, EON, including its prosecution counsel Mr. Rourke, made arguments to the PTO that contradict the teachings of the withheld references.

92.     During reexamination of the '101 patent (SN 90/010,383) and the '546 patent (SN 90/010,382), the EON attorneys and principals either failed to disclose to the PTO or buried among hundreds of references submitted on a lengthy information disclosure statement material references including U.S. Patent No. 5,291,554 ('554 patent), which issued from application number 932,257 filed on August 19, 1992 and was issued to Fernando Morales and assigned to TV Answer, Inc. on March 1, 1994, and U.S. Patent 5,392,353 ('353 patent), which issued from application number 932,241 filed on August 19, 1992 and was issued to Fernando Morales and assigned to TV Answer, Inc. on February 21, 1995.  With regard to the reexamination of the '101 patent, the EON attorneys and principals buried the '353 and '554 patents among hundreds of additional references in a lengthy IDS filed on February 19, 2010.  With regard to the reexamination of the '546 patent, the EON attorneys and principals failed to disclose the '353

and '554 patents altogether.  The applications that became the '353 and '554 patents were co-pending applications with those that became the EON patents-in-suit and were before different examiners.  The application that became the '353 patent was examined by Salvadore Cangialosi, and the application that became the '554 patent was examined by David C. Cain.  The EON patents-in-suit were both examined by Wellington Chin.

93.   The '353 and '554 patents are material to patentability of the EON patents-in-suit. Like the EON patents-in-suit, the '353 and '554 patents are both related to two-way interactive video networks.  The '353 patent, entitled "Interactive Satellite Broadcast Network" generally discloses a system and method for ensuring the privacy of point-to-point message communications in a network of interactive video stations interconnected by a broadcast network.  '353 patent at Abstract.  The '554 patent, entitled "Shared-Price Custom Video Rentals Via Interactive TV" generally discloses a two-way interactive wireless satellite video system and method for distributing movies and similar video programs from a central video program distribution center.  '554 patent at Abstract.

94.   The '353 and '554 patents are additionally material to patentability of the EON patents-in-suit because the topology of the interactive video networks disclosed in both patents are substantially similar to that disclosed in the EON patents-in-suit.  Except for the box labeled "remote receiver," Figure 1 of the EON patents-in-suit is practically identical to Figure 1 of the '353 patent and Figure 2 of the '554 patent.  All figures show local area repeater stations connected via satellite to a switch control center and regional and local service participants.  All figures also show response units that connect via radio frequency to the local area repeater station and that have memory program and interaction.  The similarity in network topology illustrated in these figures clearly indicate a material relationship.

95.     The '353 and '554 patents are further material to patentability because they are both expressly based on the technology disclosed by U.S. Patent Nos. 4,591,906 ('906 patent) and 5,101,267 ('267 patent) (collectively, Morales-Garza Patents).  *See* '554 patent at 2:6–13; 4:37–44; '353 patent at 3:6–11; 3:22–28.  The EON patents-in-suit are likewise expressly based on the technology disclosed by the '906 and '267 patents.  *See* '101 patent at 5:12–13; 4:13–16; 1:22–27.

96.     The EON attorneys and principals' failure to disclose these references to the PTO or bury them among hundreds of other references was intentional.  Both the '353 and '554 patents were issued to Fernando Morales, a former employee of EON's predecessor-in-interest, TV Answer, Inc.  Furthermore, the applications that later became the '353 and '554 patents were filed August 19, 1992, well before the applications that eventually issued as the EON patents-in-suit, which applications were filed Oct. 26, 1992 and May 10, 1994.  Additionally, the '353 and '554 patents were both assigned to EON's predecessor-in-interest, TV Answer, Inc.  Thus, the EON attorneys and principals were both aware of the applications that became the '353 and '554 patents prior to filing the applications that became the EON patents-in-suit.  They also knew the applications that became the '353 and '554 patents were pending before the PTO at the same time that the applications that became the EON patents-in-suit were pending.  They also knew about the '353 and '554 patents when the EON patents-in-suit were reexamined.

97.     Nonetheless, with respect to the '546 patent, the EON attorneys and principals failed to disclose either application or patent to the PTO during prosecution and reexamination.  And, for the '101 patent, the EON attorneys and principals failed to disclose either application or patent to the PTO during prosecution and buried the patents among hundreds in a lengthy IDS submitted to the PTO during reexamination.  With regard to the approximately 400 documents

EON submitted to the PTO, the examiner considered them "to at least the 'degree to which the party filing the information has explained the content and relevance of the information'" and in the same manner as other search results are considered. '101 Final Rejection at 3–4 (May 10, 2010).  For the '353 and '554 patents, EON provided no explanation of the content or relevance of the information; it merely listed the patents among hundreds of others.  *See* '101 Information Disclosure Statements dated Sept. 2, 2009 and February 19, 2010.  Furthermore, during reexamination, EON, including Mr. Rourke, argued to the PTO that U.S. Patent Nos. 4,591,906 and 5,101,267 could not be combined with other references because they teach only that "the TV receiver response units transmits r-f beeps, and not messages."  '101 Office Action Resp. at 35 (Oct. 7, 2009).  Mr. Rourke consistently and repeatedly argued that the Morales-Garza Patents taught only r-f beeps and that they could not be modified to provide messages.  *See, e.g.*, October 7, 2009 Decl. of Jay Kesan at 3 ("The "teachings of Morales-Garza could not be modified to provide anything other than a single r-f beep."); *id.* at 13 ("The Morales-Garza patents could not be modified to provide this element, as the Morales-Garza patents 1) only teach the use of individual r-f beeps, which are not a sequence of characters used to convey information or data."); *id.* at 16 ("Morales-Garza '906 teaches the use of r-f beeps and teaches away from the use of longer messages in order to increase the number of response units 8 that can be serviced."); *id.* at 19 ("The r-f beeps of Morales-Garza '267 are not disclosed or suggested as able to transmit any message data, address data, or other data that would be necessary to provide for two-way digital communications between two different subscriber units . . . .").  Being persuaded by EON's argument, the PTO noted that the "prior art discussed below fails to teach, among other features, that it would have been obvious to modify the 'r-f beep' into a variable

length, data message." '101 Final Rejection at 7 (May 10, 2010); '546 Notice of Intent to Issue a

Reexamination Certificate at 5 (May 11, 2010).

98.     While arguing to the PTO that Morales-Garza Patents were not capable of

conveying messages, the EON attorneys and principals withheld or buried the '353 and '554

patents, both of which teach the exchange of *messages* between subscriber units and the system,

using the teachings of the very Morales-Garza Patents EON argued *cannot* support message

transmission.  The '554 patent teaches that the "interactor feature 47 provides comprehensive

interaction with the data center 2 for exchange of *messages*, data and program software." '554

patent at 4:65–68 (emphasis added).  The '554 patent also teaches that:

> In this interactive system environment, features particularly
> relevant to the present invention are the downloading of data and
> software programs 45, and the transaction billing and processing
> 46 features, which implicitly include the data center ability to
> communicate with individual subscribers 4 and vendors 7 with
> privacy assurance *message encryption*.

'554 patent at 5:24–30.  Similarly, the '353 patent teaches that the "data control center 2, thus

intercepts all outgoing interactive *messages* broadcast over local link (18, Fig. 3) and the wide

area satellite system 1, and reforms these interactive messages for transmission to a designated

reception station (7) in point-to-point communication." '353 patent at 3:16–21 (emphasis added).

The '353 patent additionally discusses the exchange of *messages* between subscribers and the

system.  *See, e.g.*, '353 patent at 4:21–25 ("Improved privacy of communicated messages . . . is

provided in the two-way, wireless, broadcast network for processing interactive payment

transactions between subscribers 4 and vendors 7A over satellite system 1."); *id.* at 4:42–45

("Appropriately programmed PIK encryption-decryption equipment together with access to the

secret PIK are necessary for receiving and sending secret messages broadcast over the satellite

system 1."); *id.* at 6:20–22 ("Usual interactive messages may of course be encrypted in a

conventional manner, if desired."); 6:65–68 (claiming a "message processing means at each of said stations for receiving and sending interactive communications for point-to-point transmission between stations in said network"); *id.* at 2:25–39 ("It is a more specific objective of the invention to produce point-to-point communications broadcast via satellite without identifying messages, participants, transactions, or payment sources."); *id.* at 2:31–32 ("This invention provides improved privacy of communicated messages and participants . . . ."). The EON attorneys and principals' conduct in withholding or attempting to bury the '353 and '554 patents (and applications relating thereto) violated the duty of candor under 37 C.F.R. § 1.56 and constitutes inequitable conduct.

99.     The '101 and '546 patents are unenforceable because of inequitable conduct in their procurement and during reexamination of those patents. The duty of candor and good faith dealing with the PTO was violated in that material references of which EON was aware, were withheld from the PTO during prosecution of those patents. Contrary to MPEP 2001.04, 2001.05, 2001.06, and 37 C.F.R. § 1.56, EON, including the named inventor of the '101 and '546 patents Mr. Gilbert Dinkins and EON's prosecuting attorney Mr. Patrick King, failed to notify the PTO about material references related to the EON patents-in-suit during prosecution.

100.     The named inventor of the '101 and '546 patents, Mr. Dinkins, is also a named inventor on other patents including U.S. Patent No. 4,659,878 ("the '878 patent"), which Mr. Dinkins applied for on September 11, 1985 while he was employed by General Electric Company, and which is assigned to General Electric. The '878 patent is titled, "Method and Apparatus for Interference Free Communications Between a Remote Handset and a Host Subscriber Unit in a Cellular Radio Telephone System," and falls within the same general two-way wireless communications technology field as EON's '101 and '546 patents-in-suit. During

his June 14, 2010 deposition in the *Verizon* case, Mr. Dinkins testified about his General Electric

patent, including that this patent was a "cordless telephone extension for a mobile telephone,"

motivated by the problem of the limited power and interference of handheld telephones carried

by a person that were only able to transmit at approximately 600mW, compared to higher-power

mobile units found in a vehicle that could transmit at 3W.  According to Mr. Dinkins, his

patented General Electric invention allowed a person to make a call by transmitting that call

from a handheld telephone through the mobile unit, which acted as a wireless extension of the

handheld telephone, to the wireless system.  This transmission of wireless information through

the mobile unit enabled better coverage for the handheld device, which had a transmission power

that was less than the mobile unit.  (*See* June 14, 2010 Dinkins Dep. at 31−32.)  The '878 patent

itself similarly describes its purpose as reducing interference in a multi-tiered wireless

communication system, and discloses use of a repeater to relay a handset wireless transmission

from the handset to a base station cell site using a repeater (remote receiver) which, in that

patent, is disclosed to be a mobile subscriber unit.  (Dinkins '878 patent at Fig. 3 and, e.g.,

1:1−3:35; *see also id.* at Figs. 6 and 7 (describing call initiation by a handset and call

transmission to a handset via the mobile subscriber unit with a cellular system).  Mr. Dinkins

further testified at his June 14, 2010 deposition that the reason for the use of low-power

subscriber units and remote receivers in the '101 and '546 patents was to reduce interference

caused by subscriber unit transmissions with other devices.  (*Id.* at, e.g., 41−43.)  During

prosecution of the '101 patent (SN 07/966,414) and the '546 patent (SN 08/240,147), however,

Mr. Dinkins and the prosecuting attorney of those patents Mr. King failed to disclose the Dinkins

'878 patent to the PTO.

101.   The '878 patent was a material prior art reference that a reasonable PTO examiner would consider pertinent to the patentability of the '101 and '546 patents, including, the novelty and nonobviousness of those patents.  Like the '101 and '546 patents, the '878 patent related to two-way wireless communication systems.  Further, the '878 patent was filed by the same inventor, Mr. Dinkins, as the '101 and '546 patents and disclosed numerous elements of the claimed invention, including, under EON's claim constructions and arguments regarding the scope of these patents:  mobile/portable subscriber units and handheld devices; low-power/limited power/"milliwatt-range" power subscriber units and handheld devices; a two-way wireless system for transmitting wireless information; and the implementation of a multi-tiered wireless communication system including use of a repeater or "remote receiver" to relay an otherwise low-powered/"milliwatt-range" power subscriber unit to a cellular or base station network.  The materiality of the '878 patent is further evident from the fact that EON has accused similar features of Sensus's FlexNet system, including the receipt and relay of a subscriber unit message to a base station network, as infringing the '101 and '546 patents.  During prosecution of the '101 patent, the PTO only rejected the issued claims for their lack of definiteness under 35 U.S.C. § 112 ¶ 2 and not for lack of novelty under § 102 or obviousness under § 103(a).  Further, during prosecution of the '546 patent, the PTO rejected pending claims 1 and 35−47 as obvious based on U.S. Patent No. 5,177,604 to Martinez.  (Sept. 8, 1994 Office Action in SN 08/240,147, at 2.)  In response, Mr. King argued, "the Martinez reference does not disclose … [that] the subscriber unit transmits back to the cell site digital transmitter using a receive only digital receiver as set forth in the claims of the present invention."  (Dec. 6, 1994 Resp. to Office action in SN 08/240,147, at 4.)  Thus, Mr. King argued that the prior art record failed to disclose a remote receiver.  In response to this argument, and after the filing of a

terminal disclaimer to overcome obviousness-type double patenting, the PTO deemed the claims

patentable and issued a notice of allowance.  Given Mr. King's argument that the prior art of

record did not disclose a remote receiver, the PTO would have considered it material that the

named inventor, Mr. Dinkins, disclosed the same concept of using a remote receiver to relay a

low-power subscriber unit message to a cellular base station as early as 1985, and was merely

adapting that known prior art technique to the prior art IVDS systems referenced in the '101 and

'546 patents, strongly indicating that the claimed inventions in the '101 and '546 patents were at

least obvious, if not anticipated, and the PTO would have rejected the claims under § 102 and/or

§ 103(a).  Indeed, the disclosure of the '878 patent and Mr. Dinkins' testimony about that patent

refute statements made in the specification of the '101 and '546 patents arguing the patentability

of the claimed invention of those patents such as, for example, the statement that "[t]here has

been no known interactive video data service system available heretofore that has the capability

of servicing an assigned bas station area with subscriber units transmitting in the milliwatt range

… ."  ('101 patent at 1:36−44.)  Further, Mr. Dinkins testified that he was the first person to

invent a remote receiver, including a digital remote receiver, consistent with the specifications of

the '101 and '546 patents.  (June 14, 2010 Dinkins Dep. at, *e.g.*, 152−154 and 160−161.)

However, Mr. Dinkins' General Electric '878 patent discloses that Mr. Dinkins publicly

disclosed this idea as early as 1985.  Further, the Dinkins '878 patent itself refers U.S. Patent No.

3,906,166 to Cooper et al., stating that "although three tiered cellular radio telephone systems are

well known, such as that disclosed in U.S. Pat. No. 3,906,166 to Cooper et al …" and indicating

that multi-tiered wireless network systems using repeaters or remote receivers were well known

in the art.  Indeed, Sensus has asserted invalidity based on the Cooper reference, which also

would have been brought to the PTO examiner's attention had the Dinkins '878 patent been

disclosed.  A reasonable examiner would have considered Dinkins' own '878 patent, which

discloses the known prior art technique or using a repeater or "remote receiver," including both

in the '878 patent claimed invention itself, as well as by reference to the Cooper patent which

Dinkins characterized as a "three tier system," as material to determining whether the '101 and

'546 patent claimed inventions were novel and nonobvious.  The PTO examiner would have

likely rejected the claims under § 102 and/or § 103(a) given Dinkins' own acknowledgement and

disclosure of multi-tiered wireless and cellular systems using a remote receiver in the '878 patent

and by reference to Cooper, and given the extensive references in the '101 and '546 patents

referring to prior art IVDS systems and patents, including U.S. Patent No. 5,101,267 to Morales

and 4,591,906 to Morales-Garza, as disclosing the remaining elements of the claimed invention

other than a remote receiver, portable or mobile subscriber units, and low-power or "milliwatt-

level" power subscriber units.

   102.    Mr. Dinkins' failure to disclose the Dinkins '878 patent to the PTO was

intentional.  Based on his deposition testimony, the specification of the '878 patent, and the

specifications of the '101 and '546 patents, Mr. Dinkins knew that he was applying the same

remote-receiver/repeater technique and idea in both the earlier '878 patent and the later '101 and

'546 patents to retransmit and relay a low-power, milliwatt-level transmission from a subscriber

unit to a base station network, including doing so in order to reduce interference.  Further, the

disclosures of these patents and Mr. Dinkins' deposition testimony demonstrates that Mr.

Dinkins was aware of the high materiality of the '878 patent to the '101 and '546 patent claimed

invention.  Mr. Dinkins' intentional failure to disclose the '878 patent is also supported by

EON's arguments in the *Verizon* and *Sensus* cases, as well as Mr. Dinkins' own testimony,

regarding the breadth of the '101 and '546 patents, including that these patents are not limited to

IVDS or interactive video network systems having a video or television signal, and that the specification of those patents teach data telemetry applications such as vending, alarm monitoring, and meter reading.  Indeed, Mr. Dinkins testified that at the time the '101 and '546 patents were drafted, and before they were filed, he realized the broad applications for and multiple uses of the '101 and '546 patent claimed invention beyond television systems.  (June 14, 2010 Dinkins Dep. at 125−126.)  As such, Mr. Dinkins was aware of the high materiality and applicability of the '878 patent as prior art to the '101 and '546 patent, and his failure to disclose the '878 patent to the PTO was intentional.

103.    The '101 and '546 patents are unenforceable because of inequitable conduct in their procurement and during reexamination of those patents.  The duty of candor and good faith dealing with the PTO was violated in that material references of which EON was aware, were withheld from the PTO during prosecution of those patents.  Contrary to MPEP 2001.04, 2001.05, 2001.06, and 37 C.F.R. § 1.56, EON, including the named inventor of the '101 and '546 patents Mr. Gilbert Dinkins and EON's prosecuting attorney Mr. Patrick King, failed to notify the PTO about material references related to the EON patents-in-suit during prosecution, including U.S. Patent No. 3,906,166 to Cooper et al ("the Cooper patent").

104.    The Cooper patent is titled "Radio Telephone System," and discloses "a portable duplex radio telephone system for communicating with a plurality of mobile radio handsets. (*See* Cooper patent at, e.g., abstract and Fig. 2.)  The Cooper reference discloses that the base station transmitter has a "predetermined transmission range" that is shorter than the transmission range of the portable or mobile units.  (*Id.*)  As a result, Cooper discloses the addition of "satellite receivers," (*id.*) which Cooper also expressly refers to as "remote receivers," (*see id.* at 3:41−43), in order to receive and relay the lower-power mobile/portable unit transmissions.

Cooper further discloses that by the addition of these remote receivers, "the geographic area over which communications is to be provided is divided into a series of base station cells, and each station cell is subdivided into a series of sub-cells," with each sub-cell having one of the "satellite base station receivers … to receive signals from the portable transmitters." (*Id.* at 2:5−23; *see also* Figs. 1a and 2 and 5:9−11:64.)  Cooper discloses these elements of the '101 and '546 patent claims and their embodiments, as well as other elements, as shown by Exhibit A.8 to Sensus's Invalidity Contentions, which is incorporated herein by reference.

105.    As discussed in paragraphs 39−52, the Dinkins '878 patent expressly refers to the Cooper patent, which the '878 patent describes as exemplary of "three tiered cellular radio telephone systems" that were "well known" as of September 11, 1985 when Dinkins filed his '878 patent.  Indeed, in his '878 patent, Dinkins discusses Cooper as exemplary of such systems having low-power wireless handset devices, stating:

> The use of remote wireless telephone handsets in wire line telephone service systems is well-known.  The remote handsets typically operate on RF channels below 50 MHz at power levels below 100 mw.  These instruments are sold in numerous retail store outlets and require no FCC frequency assignment.  Accordingly, they usually fall on or near the same RF channel frequency, especially if they are manufactured and provided from a single supplier.
>
> As a result, an interference problem typically occurs between remote handsets and tends to degrade the service provided in proportion to the number of remote handsets operating in a given service area. A further interference problem exists in that the normally operating services in these frequency bands, i.e., TV, police, CB, utilities, etc., because of their higher power and larger populations, can render the remote sets virtually useless.  Thus, the use of remote handsets in conjunction with a host subscriber unit in a wireless cellular radio telephone system has up until now been assumed difficult to accomplish, in view of interference problems such as those above described with respect to the wireless remote handsets used in the context of wire-line systems.

> Accordingly, although three tiered cellular radio telephone systems
> are well known, such as that disclosed in U.S. Pat. No. 3,906,166
> to Cooper et al, a four tiered system using wireless remote handsets
> has up until now not been feasible.

(Dinkins '878 patent at 1:15−43.)  Thus, as of the filing of the '101 and '546 patents and during

their prosecution, Dinkins was aware of the Cooper patent.

106.    The Cooper patent was a material prior art reference that a reasonable PTO

examiner would consider pertinent to the patentability of the '101 and '546 patents, including the

novelty and nonobviousness of those patents.  Like the '101 and '546 patents, the Cooper patent

related to two-way wireless communication systems.  Further, the Cooper patent was referred to

and known by Mr. Dinkins, who characterized Cooper in his '878 patent as disclosing a three-

tier cellular system having portable/mobile subscriber units that transmit at power levels below

100mW.  The Cooper patent describes the exact same "problem" of receiving low-power

mobile/portable transmissions as the '101 and '546 patents, and presents the exact same solution:

subdivision of a base station geographic area, with the addition of satellite (remote) receivers in

these subdivisions that receive and relay low-power mobile/portable transmissions to the base

station cell site.  The Cooper patent even uses the same name for these satellite receivers as the

'101 and '546 patents—remote receivers.  (*See* Cooper patent at 3:41−43.)  Cooper anticipates or

renders obvious multiple claims of the '101 and '546 patents, as disclosed by Exhibit A.8 to

Sensus's Invalidity Contentions.  This materiality is further supported by Mr. Dinkins'

deposition testimony where, contrary to the Cooper patent, Mr. Dinkins testified that he was the

first person to invent a remote receiver, including a digital remote receiver, consistent with the

specifications of the '101 and '546 patents.  (June 14, 2010 Dinkins Dep. at, *e.g.*, 152−154 and

160−161.)  Indeed, the disclosure of the Cooper patent refutes statements made in the

specification of the '101 and '546 patents arguing the patentability of the claimed invention of

those patents such as, for example, the statement that "[t]here has been no known interactive video data service system available heretofore that has the capability of servicing an assigned base station area with subscriber units transmitting in the milliwatt range … ." ('101 patent at 1:36−44.)  Also, during prosecution of the '101 and '546 patents, the prosecuting attorney Mr. King argued that the claims were patentable over the prior art of record because that prior art, including in particular the Martinez '604 patent, did not disclose geographic subdivisions or use of a remote receiver, after which time the PTO allowed the claims.  As a result, the Cooper patent was highly material to the prosecution and patentability of the '101 and '546 patents, was not cumulative of the prior art before the PTO, and contradicted the positions taken by Mr. King during prosecution.  Had the Cooper patent been disclosed to the PTO during prosecution, the examiner would have realized that Dinkins was merely adapting the known prior art technique of using remote receivers to relay low-power transmissions from mobile/portable subscriber units as disclosed by Cooper, strongly indicating that the claimed inventions in the '101 and '546 patents were at least obvious, if not anticipated, and rejected the claims under § 102 and/or § 103(a).  The PTO examiner would have likely rejected the claims under § 102 and/or § 103(a) given Cooper's disclosure of a remote receiver and the other elements of the claimed invention, and given the extensive references in the '101 and '546 patents referring to prior art IVDS systems and patents, including U.S. Patent No. 5,101,267 to Morales and 4,591,906 to Morales-Garza, as disclosing any remaining elements of the claimed invention allegedly not disclosed by Cooper.

107.    Mr. Dinkins' failure to disclose the Cooper patent to the PTO was intentional. Based on his deposition testimony, the specification of the '878 patent, the specification of the Cooper patent, and the specifications of the '101 and '546 patents, Mr. Dinkins knew that he was

applying the same remote-receiver/repeater technique and idea from the earlier Cooper patent in

the later '101 and '546 patents to retransmit and relay a low-power, milliwatt-level transmission

from a subscriber unit to a base station network.  Further, the disclosures of these patents and Mr.

Dinkins' deposition testimony demonstrate that Mr. Dinkins was aware of the high materiality of

the Cooper patent to the '101 and '546 patent claimed invention.  Due to the citation of Cooper

in his '878 patent, Mr. Dinkins was aware of the Cooper patent.  Mr. Dinkins' intentional failure

to disclose the '878 patent is also supported by EON's arguments in the *Verizon* and *Sensus*

cases, as well as Mr. Dinkins' own testimony, regarding the breadth of the '101 and '546 patents,

including that these patents are not limited to IVDS or interactive video network systems having

a video or television signal, and that the specification of those patents teach data telemetry

applications such as vending, alarm monitoring, and meter reading.  Indeed, Mr. Dinkins testified

that at the time the '101 and '546 patents were drafted, and before they were filed, he realized the

broad applications for and multiple uses of the '101 and '546 patent claimed invention beyond

television systems.  (June 14, 2010 Dinkins Dep. at 125−126.)  As such, Mr. Dinkins was aware

of the high materiality and applicability of the Cooper patent as prior art to the '101 and '546

patent, and his failure to disclose the Cooper patent to the PTO was intentional.

108.    The '101 and '546 patents are unenforceable because of inequitable conduct in

their procurement and during reexamination of those patents.  The duty of candor and good faith

dealing with the PTO was violated in that material references of which EON was aware, were

withheld from the PTO during prosecution of those patents.  Contrary to MPEP 2001.04,

2001.05, 2001.06(a), and 37 C.F.R. § 1.56, EON, including its prosecuting attorney Mr. Patrick

King, failed to notify the PTO about material references related to the EON patents-in-suit

during prosecution.

109.    During prosecution of a PCT counterpart of the '101 and '546 patents, a PCT International Search Report identified U.S. Patent No. 4,928,177 to Martinez as a "Y" reference "of particular relevance" to the Dinkins invention disclosed by the '101 and '546 patents. Despite the high materiality of the Martinez '177 patent, Mr. King failed to disclose the Martinez '177 patent to the PTO during prosecution of the '101 and '546 patents.  The Martinez '177 patent was material, as supported by the PCT search report, as well as the reexaminations of the '101 and '546 patents, in which the PTO granted reexamination of the '101 and '546 patents based on the Martinez '177 patent, initially rejected all of the '101 patent claims and claims 1−12 and 14 of the '546 patent as obvious based on Martinez; and issued final rejections of '101 patent claims 19 and 20 for obviousness based on the Martinez '177 patent.  Further, Mr. King's failure to disclose the Martinez '177 patent was intentional, as supported by Mr. King's failure to provide a credible explanation at his deposition for this failure to disclose, and his testimony that it was routine for him to submit prior art such as the Martinez '177 patent identified in PCT search reports including those identified as relevant in the search report.  The materiality of and Mr. King's intentional failure to disclose the Martinez '177 patent is further supported by EON's practice during reexamination of the '101 and '546 patents-in-suit, during which EON has submitted hundreds of references and other litigation-related documents regarding the '101 and '546 patents.  As such, Mr. King's failure to submit the Martinez '177 patent to the PTO is contrary to EON's prior course of conduct and demonstrates that the Martinez '177 patent was material and the failure to disclose it was intentional.  In support of this defense, Sensus further incorporates by reference and refers to Verizon's Motion for Summary Judgment of Unenforceability, Docket No. 396 in the *Verizon* case.

110.    Because there exists a real and justiciable controversy between the parties regarding the enforceability of the '101 Patent and the '546 Patent, this Court should make declarations that the '101 Patent and the '546 Patent are unenforceable.

## EXCEPTIONAL CASE

111.    This case is exceptional under 35 U.S.C. § 285.

## JURY DEMAND

Sensus demands a trial by jury on all issues so triable in this action.

## PRAYER FOR RELIEF

Wherefore, Defendant Sensus prays that this Court:

(a)    Adjudge and decree that all of EON's claims are denied;

(b)    Adjudge and decree that EON's complaint be dismissed with prejudice;

(c)    Adjudge and decree that Sensus has not infringed U.S. Patent No. 5,388,101;

(d)    Adjudge and decree that Sensus has not infringed U.S. Patent No. 5,481,546;

(e)    Adjudge and decree that U.S. Patent No. 5,388,101 is invalid;

(f)    Adjudge and decree that U.S. Patent No. 5,481,546 is invalid;

(g)    Adjudge and decree that U.S. Patent No. 5,388,101 is unenforceable;

(h)    Adjudge and decree that U.S. Patent No. 5,481,546 is unenforceable;

(i)    Award Sensus its costs in this action, declare that this is an exceptional case under 35 U.S.C. § 285, and award Sensus its reasonable attorneys' fees; and

(j)    Award Sensus such further necessary and proper relief as this Court may deem just and reasonable.

Dated: July 26, 2010                         Respectfully submitted,


                                              */s/ Hilda C. Galvan*
                                             Hilda C. Galvan
                                             Lead Attorney
                                             Texas State Bar No. 00787512
                                             Email: hcgalvan@jonesday.com
                                             Keith B. Davis
                                             Texas State Bar No. 24037895
                                             Email: kbdavis@jonesday.com
                                             JONES DAY
                                             2727 North Harwood Street
                                             Dallas, TX  75201-1515
                                             Telephone:  (214) 220-3939
                                             Facsimile:   (214) 969-5100

                                             Attorneys for Defendant
                                             SENSUS USA INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was filed via CM/ECF on

July 26, 2010 and was served upon the all counsel of record via CM/ECF.

<u> /s/ Hilda C. Galvan</u>